[No. 22993–1–I.   Division One.   December 18, 1989.]

*In the Matter of the Custody of*
NATHAN THOMAS STELL.

BONNIE STELL, *Appellant,* v. THOMAS STELL,
*Respondent.*

---

*Malcolm L. Edwards* and *Edwards & Barbieri,* for appellant.

358

*William Garnett,* for respondent.

PEKELIS, J.—Bonnie Stell appeals from an order of the Superior Court awarding custody of her nephew, Nathan Stell, to Thomas Stell, Nathan's biological father. She contends that the trial court applied the wrong standard in evaluating her petition for custody of Nathan. She further contends that even under the standard applied by the trial court, it erred in ignoring uncontroverted expert testimony that placement with Tom would be detrimental to Nathan. Finally, Bonnie contends that the trial court erred in refusing to reconsider its decision, refusing to allow further testimony and refusing to appoint a guardian ad litem for Nathan. We reverse and remand.

I

Nathan Stell was born on November 5, 1981, to Tom and Deborah Stell. Tom and Deborah separated in July 1982 when Nathan was 8 months old. For the first 2 or 3 months of the separation, Tom and Deborah shared custody of Nathan, each spending equal amounts of time with him. Tom stopped visiting Nathan when Deborah's boyfriend began threatening him.

When Tom was unable to work out a visitation schedule with Deborah, Bonnie Stell, Tom's sister and Nathan's aunt, intervened. In January 1984, Bonnie successfully arranged to have Nathan visit at her home. Tom was then able to visit with Nathan at Bonnie's home. He later resumed regular visitations in April 1984.

Tom initiated a dependency proceeding in August 1984 after finding bruises on Nathan. Pursuant to court order, Nathan lived with Tom's parents, Bruce and Betty Stell, during the pendency of this proceeding. Evidence presented at the dependency hearing indicated that Nathan had been physically and sexually abused while living with Deborah and her boyfriend. In February 1985, Tom was awarded custody of Nathan, who was then 3 years old.

Tom, then 33 years old, was marginally employed in Seattle. Nathan continued to live with his grandparents in Arlington, apparently because Tom did not make enough money to care for Nathan himself, and because Nathan's therapist was in Arlington.

Tom moved in with his parents and Nathan in May 1985 in order to begin attending school. He continued residing with them until April 1986, when he graduated from school and began working. Tom's work schedule consisted of five consecutive 24–hour shifts followed by 5 days off. Due to Nathan's need for consistent therapy and Tom's work schedule, Nathan continued to reside with his grandparents.

In June 1986, when Nathan was 4½ years old, Nathan, Tom and Tom's parents visited Bonnie and her husband in California, where they had moved in December 1984. Nathan was not progressing in his therapy, and Bonnie believed that he might do better with a therapist she had located in California. Tom met the therapist and agreed to let Nathan stay. Bonnie and her husband had previously expressed a wish to assist Tom in caring for Nathan, and assumed full financial responsibility for Nathan at this time.

While in California with Bonnie, Nathan's behavioral problems diminished and he ceased to need therapy. Nathan began calling Bonnie "Mom" and uncontroverted expert testimony indicated that she became his psychological parent. During this time, Bonnie requested joint custody of Nathan. Tom refused. Tom visited Nathan in California once in the 13 months Nathan was there and talked with him on the telephone on other occasions.

Bonnie separated from her husband in July 1987 and moved back to Washington with Nathan. Nathan was then 5½ years old. Although Nathan continued to reside with Bonnie, he also spent several nights a month with his grandparents. The actual number was disputed.

In September 1987, Tom moved to Eastern Washington to work on a farm owned by three elderly uncles. He

returned to visit Nathan every 2 or 3 weeks and testified that he planned to bring Nathan over to Eastern Washington to live at some point. He felt he was getting back on his feet and was ready to begin taking responsibility for Nathan's care. Tom was then 36 years old.

Family conflict over custody of Nathan escalated after Bonnie returned to Washington. One evening in January 1988, Bonnie again requested that Tom give her joint custody of Nathan. Tom became very angry and refused. The next day, Bonnie went to her parents' home to pick up Nathan, who had spent the night there. When Tom refused to let her take Nathan, Bonnie became very upset and had a physical confrontation with her father.

Shortly thereafter, Bonnie filed a third party custody action seeking custody of Nathan. The trial court awarded Bonnie temporary custody, allowing Tom visitation rights on alternate weekends. Nathan was 6 years old at that time.

Bonnie contacted Dr. Steven Taylor, a clinical psychologist, and asked him to mediate the conflict between her and her family. Bonnie and her parents had two sessions with Dr. Taylor, after which Bonnie continued individual therapy with Dr. Taylor. Dr. Taylor saw Nathan in March 1988 and testified at the custody hearing that he was not functioning well at that time. Sometime after Dr. Taylor first saw Nathan, the court appointed Dr. Barry Nyman, also a clinical psychologist, to evaluate the Stell family and provide the court with a recommendation regarding Nathan's custody.

When Nathan had a violent emotional outburst at school in June 1988, Bonnie asked Dr. Taylor to see Nathan again. Dr. Taylor did so after consulting Dr. Nyman. Dr. Taylor reported that Nathan was under acute emotional stress due to the conflict between his father and his "mom" Bonnie. He advised that a break in visitations with Tom would be in Nathan's best interests.

In July 1988, the court entered an order approving Nathan's being placed in therapy with Dr. Elizabeth Robinson. The order provided that all contacts between

Nathan and Dr. Robinson were to be strictly and absolutely privileged and that she was not to be called as a witness in the custody dispute. The court also suspended in–person visitations between Tom and Nathan. Telephone visitations were permitted, but Tom testified that he stopped calling when he learned that the calls upset Nathan.

The custody trial was held in late July 1988. Tom testified that if Nathan was left in his custody, he would keep his present job rather than move to Eastern Washington, would keep Nathan in therapy and would obtain an appropriate residence for himself and Nathan. At the time of the hearing, Tom was employed as a nurse's aide, a position he had held for approximately 5 months. He did not yet have an appropriate residence for Nathan.

Dr. Nyman testified at the custody hearing and his report was admitted in evidence without objection. In Dr. Nyman's opinion, placing Nathan with Tom would be detrimental to Nathan. Based on numerous detailed considerations, Dr. Nyman concluded that Tom was unable to meet Nathan's special need for stability and consistent parenting. Dr. Nyman reported in part:

It appears that Nathan has suffered inconsistent and, at times, abusive parenting in his young life. . . . The most constructive period for Nathan was the year he lived with Bonnie in California and received therapy and her consistent support. . . . Bonnie has demonstrated her commitment to Nathan and his special needs. Tom, no doubt, loves Nathan, and while his actual parenting has been indecisive and inconsistent, he has attempted to provide Nathan with the best that his family has had to offer. Now Tom says that Nathan "needs his dad" and believes that he can provide for Nathan's security simply by taking custody of the child. Tom does not see that Nathan has been damaged so severely by his early relationship with Deborah, that extraordinary measures to provide security and stability are required now to mitigate those formative experiences. While Tom, Bonnie and their parents have all attempted to provide Nathan with emotional security through the love and care of his extended family, it is apparent that Nathan needs more to adjust satisfactorily—he needs the stability of a consistent parent. Bonnie can provide that consistency and thus far only she has provided Nathan with the consistency required for his adequate adjustment. . . . It appears essential

for Nathan's recovery now that he return to the consistent and stable parenting which Bonnie provided for him in California.

The day after the hearing ended, the court issued a memorandum decision denying Bonnie's petition for custody of Nathan. The court ruled that Tom had a constitutional priority right to custody of Nathan, and that Bonnie had failed to establish that Tom was unfit or unsuitable. The memorandum decision did not address the issue of whether placing Nathan in Tom's custody would be detrimental to Nathan's growth and development.

Before the court entered its written findings of fact and conclusions of law, Bonnie moved for reconsideration and for appointment of a guardian ad litem. Her motion was based on a letter to the court from Dr. Nyman and a letter dated August 8 from Dr. Robinson, Nathan's therapist. In her letter, Dr. Robinson stated that:

> I feel very strongly that it is not in Nathan's best interests to change custodial parents at the present time. Bonnie Stell is his psychological mother and Nathan is extremely attached to her. Nathan has a long history of disordered parenting and another change of residence at this time will be extremely detrimental to his emotional well–being.

Dr. Nyman's letter essentially restated the opinion he had expressed at trial.

The court refused to reopen and signed findings of fact and conclusions of law presented by Tom's attorney on August 19, 1988. At the request of both parties, he appointed Dr. Robinson to direct the transition of custody from Bonnie to Tom.

In November 1988, before the transition was completed, Dr. Robinson wrote to counsel and advised them she wished to resign as mediator, stating that she could not ethically facilitate a transition which she believed was not in Nathan's best interests. Nathan had become progressively more disturbed as the transition progressed, exhibiting acute emotional distress and behavioral problems. Dr. Robinson stated that Nathan's inner turmoil and anger emerged in play therapy, where "the entire theme of his play is the killing, injury, kicking and burning up in an

oven a string of dozens of characters." Nathan was also having difficulty concentrating in school, which Dr. Robinson believed was a symptom of stress. Dr. Robinson further stated that Nathan's behavioral problems were a result of his inability to deal with Tom's poorly controlled anger toward Bonnie.

Based on these developments, Bonnie again moved the court to appoint a guardian ad litem for Nathan to report to the court on issues related to the custody transition process. She also moved for orders relating to Dr. Robinson's future role in the case and for compliance with her recommendations. There appears to have been no specific ruling on these motions, but no guardian ad litem was appointed. Bonnie brings this timely appeal assigning error to a number of the court's rulings.

## II

Bonnie contends first that the trial court erred in according a priority right to Tom, Nathan's natural parent, and in refusing to apply the "best interests of the child" standard.

Bonnie's petition for custody of Nathan was brought under RCW 26.10, governing nonparental actions for child custody. Prior to the enactment of RCW 26.10 in 1987, all custody proceedings were governed by RCW 26.09, the uniform marriage and divorce act. The standard for determining custody was set forth in RCW 26.09.190, which provided that "[t]he court shall determine custody in accordance with the best interests of the child. . . ."[1]

The Legislature expressed its intent in enacting RCW 26.10 as follows:

> It is the intent of the legislature to reenact and continue the law relating to third–party actions involving custody of minor children in order to distinguish that body of law from the 1987 parenting act amendments to chapter 26.09 RCW, which previously contained these provisions.

---

[1] RCW 26.09.190 was repealed when the Legislature enacted the 1987 parenting act amendments to RCW 26.09.

RCW 26.09.010. In accordance with its intent to reenact previous law, the Legislature reenacted the requirement that "[t]he court shall determine custody in accordance with the best interests of the child." RCW 26.10.100. The issue presented here is whether the Legislature also intended to "reenact" judicial interpretation of the identical provision in RCW 26.09.190.

The trial court concluded that when the Legislature expressed an intent to continue the law, it intended to include the case law which had established standards for resolving custody disputes between parents and nonparents. The trial court further concluded that since this case law establishes that natural parents have a constitutionally protected priority right to custody of their children, RCW 26.10.100 must be read to require more than the usual "best interests" test. Thus, the trial court ruled that a parent has a priority right to custody "unless the parent is either unfit or placement of the child with the parent would detrimentally effect [*sic*] the child's growth and development," relying on the test developed by the court in *In re Marriage of Allen*, 28 Wn. App. 637, 626 P.2d 16 (1981) and followed by the court in *Chapman v. Perera*, 41 Wn. App. 444, 704 P.2d 1224, *review denied*, 104 Wn.2d 1020 (1985).

Bonnie contends that the trial court erred in relying on prior case law, arguing that RCW 26.10.100 overrules this case law and establishes a pure "best interests of the child" standard. She also argues that there is no constitutional right to custody that controls this issue. Thus, she claims, we are free to follow the "best interest of the child" standard set forth in RCW 26.10.100.

■■ We hold that a plain reading of RCW 26.10.100 does not demonstrate a legislative intent to disregard prior judicial interpretations. Rather, we conclude just the reverse. The language of RCW 26.10.100 is identical to the language of former RCW 26.09.190. In construing legislation, this court presumes that the Legislature is familiar with past judicial interpretations of its enactments. *State v.*

*McCullum,* 98 Wn.2d 484, 492–93, 656 P.2d 1064 (1983). Therefore, the fact that the Legislature reenacted the language of former RCW 26.09.190 in RCW 26.10.100 indicates that it intended cases construing RCW 26.09.190 to have continuing validity. Moreover, RCW 26.10.010 expressly states that "[i]t is the intent of the legislature to reenact and continue the law relating to third–party actions involving custody of minor children . . .". It follows that RCW 26.10.100 was not intended to overrule prior case law regarding third–party custody disputes.

Thus, we conclude that the trial court correctly determined that the standard established by the *Allen* court was the correct standard by which to evaluate Bonnie's petition for custody. *See In re Marriage of Allen,* 28 Wn. App. at 646. The test adopted by the *Allen* court acknowledges the constitutional right to privacy implicated in custody disputes and establishes a test which is sensitive to both a biological parent's rights and the needs of a child. This standard requires that the nonparent establish either that the parent is unfit or that "circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent".[2] *In re Marriage of Allen,* 28 Wn. App. at 647.

### III

Bonnie also contends that even if the standard established in *Allen* applies, proper application of the test could only result in awarding custody of Nathan to her rather than Tom. She argues that all the experts testified that placing Nathan in Tom's care would be detrimental to Nathan. This evidence, she claims, is as strong as that in *In*

---

[2]We believe that the standard established by the *Allen* court is an appropriate balance of the competing interests at stake in a third party custody action. Thus, we find it unnecessary to decide whether, as the trial court concluded, constitutional considerations would prohibit application of a "best interests" standard to third party custody disputes. Although the *Allen* court held that a more stringent test than the "best interest" approach was required, it suggested that the primary reason for deferring to parental rights was the goal of preserving families. *In re Marriage of Allen,* 28 Wn. App. at 648.

re Marriage of Allen, 28 Wn. App. 637, 626 P.2d 16 (1981), and was not contradicted by any other expert testimony. Thus, she claims the trial court abused its discretion in entering that part of conclusion of law 12 which states:

> The Petitioner must prove that there will be a detriment to Nathan's growth and development if custody remains with Thomas. At most the testimony shows speculation (largely without supporting evidence) about what Thomas may or may not do with regard to Nathan's needs. There is no proof of a detriment nor proof that Thomas cannot or will not provide for Nathan's need for stability and therapy. The Petitioner has failed to meet her burden on the issue of detriment to Nathan.

In *Allen* a deaf child had become integrated into the family unit formed by the marriage of his father and stepmother and by his father's adoption of his stepmother's three children. *In re Marriage of Allen*, 28 Wn. App. at 648. In addition, the stepmother and her three children had all learned sign language, and the child's educational and developmental progress were the result of the stepmother's efforts to secure special training. *In re Marriage of Allen*, 28 Wn. App. at 641. The father had minimal sign language skills. *In re Marriage of Allen*, 28 Wn. App. at 647. Applying the "detriment to the child" test to these facts, the *Allen* court affirmed the trial court's award of custody to the stepmother. *In re Marriage of Allen*, 28 Wn. App. at 647.

■ We are mindful that, unlike in *Allen*, the posture of this case is such that Bonnie asks this court to set aside the trial court's custody determination. Appellate courts are generally reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties. *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981). For this reason, a trial court's custody disposition will not be disturbed on appeal absent a manifest abuse of discretion. *Chapman*, 41 Wn. App. at 446. Nevertheless, here there is simply no evidentiary support or explanation for the court's conclusion that Bonnie failed to meet her burden of proof on the issue of

detriment to Nathan. We are thus constrained to find that the trial court abused its discretion.

The trial court's findings of fact are, at best, marginally relevant to the issue of detriment to Nathan.[3] The court's finding of fact 16 purports to address detriment, but makes no finding directly probative of the issue:

> The evidence does not establish that continued placement of custody with Thomas would be detrimental to Nathan's growth and development. Nathan is in need of a stable home situation, which Thomas can provide. He is in need of therapy to help him through the trauma of this custody fight and to deal with problems resulting from early experiences. Thomas is aware of this need and is willing and able to provide therapy. In view of Nathan's close relationship with Bonnie reasonable visitation should be granted to her. Both Thomas and Bonnie have indicated that they are willing to work together on visitation but record of this case indicates otherwise, so set visitation should be provided.

Even if we consider finding of fact 14, which appears to address the issue of unfitness, we find nothing probative of the issue of detriment:

> Thomas has not been as financially successful as his sister Bonnie. He held a number of jobs. He says he has never been fired from a job and there is no evidence to the contrary. In the past he has been unable to provide a home for Nathan, mainly because of financial pressure. He now has steady employment and can provide a home and care for Nathan. Day care is available to him while he is working. Thomas is a loving father and the evidence shows he has done the best he could under all the circumstances. He has not neglected or ignored his parental rights and duties and has always been interested in Nathan. He has participated in Nathan's care while they have lived in the same house. His placing Nathan with his parents and with Bonnie for therapy indicates a willingness to sacrifice his interest from what he percieved [*sic*] to be Nathan's best interest. The evidence is that Nathan and Thomas have a close loving relationship. Thomas is not an unfit or unsuitable parent.

---

[3]Some of the court's findings of fact are entirely irrelevant to any of the issues before it. For example, finding of fact 11 states: "Bonnie lived with at least two different men during this period, Nathan was present while this was going on and was aware that Bonnie was still married to Don. Although a divorce action was commenced in California at some point Bonnie is still married to Don Mizurik."

None of these findings of fact contradict Dr. Nyman's uncontroverted and unrebutted opinion that placing Nathan with Tom would be detrimental to him. In light of the evidence and the trial court's own findings, its conclusion that "[t]here is no proof of a detriment nor proof that Thomas cannot or will not provide for Nathan's need for stability and therapy" cannot be sustained.

Generally, the trial court is free to reach its own conclusions from the testimony before it. However, "the trial courts should rely on expert opinion to help reach an objective, rather than subjective, evaluation of the issue." *In re Marriage of Woffinden,* 33 Wn. App. 326, 330 n.3, 654 P.2d 1219 (1982), *review denied,* 99 Wn.2d 1001 (1983). It appears that the trial court here simply disregarded Dr. Nyman's explicit testimony despite the fact that he was appointed to assist the court.

■ Equally insupportable is the trial court's conclusion that Tom at age 36 was somehow able to physically and psychologically care for Nathan although he had never been able to before. It is error to award custody based on projections about what will occur in the future. *In re Marriage of Nordby,* 41 Wn. App. 531, 534, 705 P.2d 277 (1985). Although the trial court concluded that there was no proof of detriment, because "[a]t most the testimony shows speculation (largely without supporting evidence) about what Thomas may or may not do . . .," it is the trial court's own conclusion regarding Tom that was speculative.

We do not find any support in the record for the trial court's finding, which is more in the nature of a conclusion, that because Tom now has steady employment he would be able to provide the kind of special care that Nathan unquestionably requires. Tom has a history of unsteady employment and at the time of trial had held his present job for only 5 months. More importantly, he did not at the time of trial even have appropriate housing for himself and Nathan. In fact, he has not been able to provide Nathan with a home since Nathan was 7 months old.

In addition, there was uncontroverted evidence that Bonnie had become Nathan's psychological parent. However, in finding of fact 13 the court finds only that "2 psychologists testified Bonnie became psychological parent". This finding is inexplicably ambiguous; did the court accept this testimony and, if not, on what basis was it rejected?

Tom urges us to reject the "psychological parent" theory. We refuse the invitation to do so. As the *Allen* court recognized:

> [I]t was formerly thought that blood ties between parent and child were extremely important. Now it is learned that kinship is not as important as stability of environment and care and attention to the child's needs. *See* J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* (1973).

*In re Marriage of Allen,* 28 Wn. App. at 648 (quoting *In re Aschauer,* 93 Wn.2d 689, 697 n.5, 611 P.2d 1245 (1980)). In addition, as pointed out by the court in *Allen,* where the child becomes integrated into the nonparent's family unit, "the reason for deferring to parental rights—the goal of preserving families—would be ill-served by maintaining parental custody". *In re Marriage of Allen,* 28 Wn. App. at 648. In *Allen,* the court concluded that the psychological relationship between the nonparent, her family and the child had become "equivalent to that of a natural family entity." *In re Marriage of Allen,* 28 Wn. App. at 648.

We agree that these considerations cannot be ignored in custody disputes such as the one before us. According to the testimony of Dr. Nyman and Dr. Robinson, Bonnie is Nathan's psychological parent and the only person able to provide him with consistent parenting. Bonnie and Nathan represent a family unit in which Nathan has experienced a degree of stability not possible in his relationship with his father and his grandparents.

In sum, we conclude that the trial court's refusal to give any credence to the overwhelming and unrebutted expert testimony of detriment cannot be sustained. On this record, we hold that Bonnie met her burden of proof on the issue.

## IV

We also conclude that the trial court erred in refusing to reopen to consider the opinion of Nathan's therapist offered as part of Bonnie's motion to reconsider. Dr. Robinson's opinion was that the contemplated change of custody would be "extremely detrimental to [Nathan's] emotional well–being." We cannot determine from the record why the trial court refused to reopen to consider this testimony. However, we note that the court's prior order barring any of the *parties* from calling Dr. Robinson as a witness should not bar consideration of Dr. Robinson's voluntarily offered opinion.

 ▪ In a similar situation in *Atkinson v. Atkinson,* 38 Wn.2d 769, 231 P.2d 641 (1951), the trial court had indicated in its oral decision that it would give custody of a 6–year–old boy to his mother. The father made a motion to reopen based on a doctor's affidavit concerning the mother's mental health. The Supreme Court observed:

> From a technical standpoint, the trial court was justified in refusing to reopen the case for the proffered testimony, as it could have been offered at the trial and was cumulative; and we find no error in that ruling. However, it seems to us that in this most difficult of all problems, the custody of children, the trial court should seek all the light available.

*Atkinson,* 38 Wn.2d at 771.

We agree and cannot condone the trial court's refusal to consider Dr. Robinson's valuable testimony. The refusal is all the more unjustifiable where the trial court's custody decision was based on its claim of insufficient evidence of detriment. Her proffered testimony provided compelling evidence of detriment.

 ▪ Likewise, we are of the view that the trial court's refusal to appoint a guardian ad litem was, at the very least, ill advised. A trial court should appoint a guardian ad litem or an attorney for a child if it would assist the court in determining the custody issue. *Nordby,* 41 App. at 534–35. By the time the second request was made, Dr. Robinson had resigned as transition coordinator and had *explicitly* detailed examples of both Nathan's degenerating state and

of Tom's poorly controlled anger toward Bonnie. If anything else, her observations should have confirmed Dr. Nyman's evaluation and prompted the court to order further investigation.

In conclusion, although "[w]e are loathe to disturb the determination of the trial court with reference to the custody of children," we cannot condone the court's refusal to consider repeated and unanimous independent expert opinions. *Atkinson,* 38 Wn.2d at 772. The court remained fixed in a position virtually unsupported by anything but the most speculative and conclusive testimony.

The trial court's order of permanent custody is reversed and the matter remanded to the trial court for a new trial. We regret that the sometimes necessary delays in our judicial system work to the disadvantage of children such as Nathan. We are well aware that Nathan's present situation could well have changed in ways which our holding cannot anticipate. Therefore, Nathan's situation as it presently exists should be assessed with the assistance of a guardian ad litem and the matter heard as soon as possible by a judge other than the judge herein.

GROSSE, A.C.J., and RINGOLD, J. Pro Tem., concur.