**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| In the Matter of the Custody of B.M., | No.  53774-5-II |
| A minor child, | |
| LAURA TODD, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DESIREE S. TODD, | |
| Appellant, | |
| TRAVIS E. MILLAR, | |
| Respondent Below. | |

GLASGOW, J.—Desiree Todd appeals the court's order granting nonparental custody of her daughter, BM, to her mother, Laura Todd. Desiree[1] asserts that the court erred by denying her motion for a continuance, reassigning the case to a non-family court judge, and giving significant weight to a witness Desiree claims was bribed. Desiree argues that substantial evidence did not support the court's factual findings. Desiree also asserts that the court erred by finding that BM would suffer actual detriment in Desiree's custody and by finding that Desiree was an unfit parent.

The court did not err by denying Desiree's motion for a continuance and reassigning the case to a non-family court judge, nor did the court rely improperly on witness testimony. Substantial evidence supported the court's factual findings, including that Desiree was an unfit

---

[1] For clarity, we refer to some of the parties by their first names.

parent, and the court properly found that BM would suffer actual detriment if left in Desiree's custody. We affirm.

FACTS

A.     Medical Background

BM was born to Desiree and Travis Millar in 2017. Before she was born, BM was diagnosed with congenital talipes equinovarus deformity (CTEV)[2] of the left foot. BM began receiving treatment at Mary Bridge Children's Hospital in early February 2017 when she was six days old.

BM's doctor explained to Desiree and Millar that the process of treating BM's CTEV would require putting her foot and leg in a series of casts, each worn for a week at a time for six to ten weeks, followed by long-term use of a brace. The doctor also explained the possibility of a minor surgery to lengthen BM's Achilles tendon. Desiree and Millar were given a written visit summary that emphasized the importance of consistently attending weekly casting appointments and otherwise complying with treatment to avoid relapse. BM's left foot was placed in a molded cast at the first appointment.

As early as April 2017, BM's doctor, Nicholas Rajacich, observed that BM's parents removed her cast early, causing relapse. In May 2017, Dr. Rajacich wrote, "Mom apparently took the cast off early because of a trip to Arizona and [BM] wanted to go into the pool. So she has been out of [the] cast now for well over a month" and her foot "quite marked[ly] relapsed." Ex. 5, at 98. In July 2017, BM's cast was off for weeks because BM's parents had car trouble and were unable to return to the office, again causing relapse.

_____

[2] This diagnosis is commonly referred to as "clubfoot."

In early September 2017, Dr. Rajacich wrote, "[BM] has not been seen in the office for over a month. Her mom says that they took a break from treatment because they were [vacationing] in Arizona and visiting Grandma." Ex. 5, at 177. The next month, Dr. Rajacich observed, "I feel that we are running into a little bit of trouble here" and suggested that "delays between care" prevented BM from making progress. Ex. 5, at 192.

In November 2017, Dr. Rajacich performed a successful minor surgery to lengthen BM's Achilles tendon. However, a month later, BM presented with "essentially a fully relapsed clubfoot." Ex. 5, at 252. Dr. Rajacich found the situation "more than a little bit frustrating," and wrote, "[t]he cast came off early and nothing was done about it, and now we are dealing with essentially failure of the surgical correction. I am hoping that we can regain this by serial casting, although I am not entirely optimistic." *Id.* By January 2018, Dr. Rajacich projected, "[F]uture repeat recurrent posterior release is going to be needed" to compensate for relapses caused by the fact that BM had not been consistently wearing a cast. Ex. 5, at 291.

Because the casts had been irritating BM's skin, Dr. Rajacich decided in March 2018 to use a brace method instead. Dr. Rajacich told Desiree that BM needed to wear the brace full time. There is no evidence of any medical visits between March 2018 and September 2018, even though BM's doctor instructed her parents to bring her back in April 2018. In September 2018, BM was seen by a different provider at Mary Bridge Children's Hospital who described her foot condition as a "[q]uite severe . . . deformity especially for [the] patient's age and prior manipulations." Ex. 5, at 364. Desiree also acknowledged that BM only wore the brace 25 percent of the time instead of full time as doctors instructed.

B.      Laura's Motion for Nonparental Custody of BM

In fall 2018, Laura petitioned for nonparental custody of BM. A Pierce County Superior Court commissioner found a prima facie showing of adequate cause and granted Laura temporary custody of BM.

The court ordered and Laura paid for Desiree to obtain a urinalysis test in September 2018, but Desiree did not provide enough urine to complete the test. The court then ordered Desiree to submit to an immediate urinalysis and hair follicle test in October 2018, but Desiree did not comply. As a result, the court considered the hair follicle test positive. Desiree later completed a urinalysis when ordered by the court in March 2019 and tested negative for illegal drugs but positive for marijuana.

In April 2019, the court denied Desiree's motion for summary judgment, scheduling a trial for June 11, 2019. On June 4, 2019, Desiree filed a motion for a continuance, arguing that she was in the "final stages of engaging counsel to represent her," and needed "[m]ore time . . . to get the [a]ttorney familiar with the facts and history of the case." Clerk's Papers (CP) at 153. Desiree did not note the motion for a hearing.

On the day of trial, the case was transferred from a judge in the family court division to Judge Grant Blinn in the civil division.

C.      Nonparental Custody Trial

On the morning of trial, Desiree moved verbally for a continuance. The trial court denied Desiree's motion, ruling that the case had been pending for nine months, witnesses had traveled from out of state, and it was in BM's best interest not to postpone trial further. Desiree also moved to "remove" her former friend, Misty Stephenson, from testifying as a witness on the basis that she was not a credible witness and had a "vendetta" against Desiree. Verbatim Report of Proceedings

(VRP) (June 11, 2019) at 10-11. The trial court allowed Stephenson to testify and ruled that any issues about her credibility or motives would inform the weight the court would give her testimony.

Laura, represented by counsel, called Desiree, Millar, Stephenson, Alex Almonte (Desiree's stepfather, who was no longer married to Laura), and Jean Todd (Desiree's grandmother and Laura's mother). Laura also testified. The trial court admitted numerous exhibits under ER 904, including BM's medical records, which contained the facts described above about missed appointments and repeated relapse.

Laura, Almonte, and Jean testified that Desiree did not bring BM to all of her medical appointments and repeatedly allowed BM's casts to remain off for extended periods of time, causing relapses and requiring further interventions, including a second surgery. Laura testified that Desiree did not have a reliable vehicle or access to transportation and had been driving without a license. Almonte and Jean both testified that they and their spouses had offered to transport Desiree and BM to doctor's appointments, and their schedules were flexible enough to provide rides any time.

 Desiree acknowledged that she missed medical appointments and BM did not consistently wear her casts or brace. Desiree also testified that she forgot to send BM's brace with her when BM went to visit Laura in Arizona. Desiree testified that BM had never been to a pediatrician while she was in her care, although she told Laura she had a pediatrician to "get her off [her] back." VRP (June 11, 2019) at 92.

Laura testified that Desiree told her she used methamphetamine, although Laura never saw Desiree using drugs. Almonte believed Desiree appeared to be using drugs. Stephenson testified that she used drugs with Desiree multiple times. The exhibits also included a picture, allegedly of

a room in Desiree's home that included her purse, other items that belonged to her, scales, and a homemade pipe.

Laura, Almonte, and Jean expressed concern about Desiree's ability to provide the basic necessities of life for BM. Almonte testified that Desiree did not have stable housing when BM lived with her, and he described unsafe and unsanitary living conditions. Examples included pet urine and feces on the floor in one location and that Desiree temporarily housed BM on a boat without adequate safety precautions to keep a toddler from falling in the water.

Laura testified that she believed BM would suffer actual harm to her physical and emotional development if she remained in Desiree's custody. Laura also explained that she and her husband planned to move back to western Washington as soon as possible, she was confident that she would remain employed and able to provide health insurance for BM, and they planned to purchase a house in Pierce County, close to BM's family.

Laura explained that she wanted nonparental custody to be temporary until one or both parents could meet BM's needs, including her medical needs. Laura proposed that she be awarded nonparental custody but that the trial court also enter a graduated parenting plan, allowing for three phases where Desiree's visitation would advance from supervised to unsupervised and would increase over time if she remained drug free and could ensure transportation to medical appointments. Later phases of the proposed parenting plan called for overnight visits with the goal of eventually dismissing the nonparental custody order.

Desiree did not call her own witnesses but she cross-examined each of the witnesses Laura called and attempted to discredit their testimony. During her cross-examination of Stephenson, Desiree attempted to show that Laura had bribed Stephenson to testify by paying to have Stephenson's dog released from the animal shelter.

D.        The Trial Court's Ruling

The trial court granted Laura nonparental custody of BM. In written findings of fact, the trial court found that both parents had long-term chemical dependency problems that interfered with their ability to parent, chaotic living environments, and "long[-]term housing, employment, and transportation instability." CP at 172. The trial court found that both parents substantially refused to perform parenting functions as defined by RCW 26.09.004(2)(b) and (e). The trial court found both parents were medically neglectful by failing to comply with BM's CTEV treatments or provide BM with regular preventative care and that they failed to exercise reasonable judgment regarding BM's welfare.

The trial court concluded that both parents were unfit and actual detriment would occur if BM were placed in the custody of either parent. The trial court then concluded that BM should live with Laura "because [she] . . . established stability in the child's housing, access to medical care and treatment, and physical, mental, and emotional development." CP at 172.

The trial court also adopted the graduated parenting plan, calling for three phases with increasing visitation. The trial court ordered chemical dependency evaluations for both parents, participation in any recommended treatment programs, and proof of a clean urinalysis and hair follicle test to advance to the next phase at each stage. The trial court also required the parents to show proof of access to some type of lawful transportation. The trial court anticipated that at the end of the third phase, the parties would be ready to revisit whether nonparental custody was still necessary.

Desiree appeals the trial court's decision granting nonparental custody of BM to Laura, but not the parenting plan.

ANALYSIS

I. PROCEDURAL ISSUES

A.    Motion for Continuance

Desiree argues that the trial court violated her "constitutionally guaranteed procedural due process right to have effective counsel to assist her in protecting her rights to her child" by denying her motion for a continuance. Br. of Appellant at 10. Desiree also argues she was prejudiced by the denial of the continuance because, without a lawyer, she did not know how to object under ER 904 to the admission of exhibits and was forced to conduct a trial for which she was unprepared. We disagree.

Washington courts review the denial of a continuance motion in a custody proceeding for manifest abuse of discretion. *In re Custody of C.D.*, 188 Wn. App. 817, 828, 356 P.3d 211 (2015). In *C.D.*, Division Three considered a parent's argument that the denial of a continuance in a custody trial should be reviewed under a constitutional error standard. *See id.* at 828-29. Division Three acknowledged that "'[p]arents have a fundamental liberty and privacy interest in the care and custody of their children,'" but noted that the heightened constitutional protections applicable to termination or dependency proceedings are not implicated in custody proceedings, which occur between private parties and do not permanently sever parental rights. *Id.* (quoting *In re Welfare of R.H.*, 176 Wn. App. 419, 425-26, 309 P.3d 620 (2013)); *see also In re Marriage of King*, 162 Wn.2d 378, 385, 394, 174 P.3d 659 (2007). Applying abuse of discretion review, Division Three held that the trial court did not abuse its discretion by denying a parent's motion for a continuance made on the day of trial, where witnesses had traveled and cleared their schedules for the trial date. *C.D.*, 188 Wn. App. at 829. Division Three further held that even if the denial of the continuance

motion implicated due process rights, "the appellant must show either prejudice from the denial or that the trial result would have been different had the continuance been granted." *Id.* at 828.

The trial court did not abuse its discretion by denying Desiree's motion for a continuance. Desiree filed a motion for continuance a week before the trial date stating that she was "working on securing Michelle Raiford as her attorney for trial" and Raiford was "unavailable the week of trial." CP at 153. But Desiree did not note the motion or otherwise take steps to have the motion heard before trial. Nor does the record show that she served her motion on Laura's counsel.

On the morning of trial, the trial court emphasized that it was in BM's best interests to proceed to trial and resolve the custody dispute because the case had been pending for nine months. The trial court also noted that witnesses had traveled from out of state. The trial court emphasized that the proceeding did not involve the termination of parental rights. As in *C.D.*, the trial court's reasons for denying Desiree's motion for a continuance were not manifestly unreasonable. *See* 188 Wn. App. at 828-29.

Desiree also has not shown that she was prejudiced. Desiree was "working on" securing counsel, but the record does not show that Desiree had retained a lawyer who would have been able to represent her at a later date. CP at 153. Desiree asserts that she was prejudiced because she did not know she could object to Laura's exhibits under ER 904, but she does not show that an attorney would have been successful in objecting to any of the exhibits that the trial court considered. Desiree effectively cross-examined witnesses, and Desiree and Millar both testified at trial about their side of the facts. None of Desiree's arguments establishes a reasonable probability that the result of the proceeding would have been different if she were represented by an attorney. We hold that the trial court properly denied Desiree's motion for a continuance.

B.       Reassignment to Judge Blinn

Desiree argues that the court erred by reassigning the case to Judge Blinn because he was not in the family court division. Desiree cites PCLR 94.04(f)(4), which requires that all nonparental custody cases be assigned to family court. Desiree asserts that any other rules permitting reassignment must yield to PCLR 94.04(f)(4). We reject this argument.

Under RCW 26.12.010(1), superior courts have jurisdiction over any proceeding involving "the rights of the parties or their children regarding . . . child custody." And under RCW 26.12.020, some of the judges of the superior court will be assigned on a yearly basis to hear family court matters. But RCW 26.12.030 specifically authorizes the reassignment of family court proceedings to any other superior court judge if "necessary to expedite the business of the family court or to insure the prompt consideration of the case" and provides that "[w]hen any case is so transferred, the judge to whom it is transferred shall act as the judge of the family court in the matter." Moreover, PCLR 40(e)(1) permits reassignment when "the assigned judicial department is unable to hear a preassigned matter," and this local rule is compatible with the statutes described above. *See* RCW 26.12.010-.030.

Desiree offers no evidence that reassignment was not necessary to "expedite the business of the family court" or "insure the prompt consideration of the case." RCW 26.12.030. The trial court did not err by transferring this case to Judge Blinn on the day of trial.

C.       Testimony of Stephenson

Desiree argues that "[t]he trial court erred by placing significant weight on the testimony of" Stephenson, who she asserts was bribed by Laura. Br. of Appellant at 11 (boldface omitted). Desiree argues that she was prejudiced by this error because Stephenson's testimony contributed to the trial court's finding that Desiree had a long-term substance abuse problem. We disagree.

Desiree attempted to discredit Stephenson's motives for testifying, but neither Laura nor Stephenson admitted to paying or receiving a bribe and Desiree did not otherwise establish that bribery occurred. Text messages show that Laura asked for Stephenson's help proving Desiree's substance use, Laura helped pay for Stephenson's dog to be released from the animal shelter, and Laura asked if there was anything else she could do to help Stephenson. However, these text messages do not show that Laura thought Stephenson was going to testify in a legal proceeding in exchange for helping with the dog, or that Laura intended to influence the content of anyone's testimony in any way. *See* RCW 9A.72.090(1)(a) (elements of bribing a witness include intent to influence testimony).[3]

The trial court properly concluded that concerns about Stephenson's bias would go to the weight of her testimony, but not its admissibility. In finding that both legal and illegal drug use impaired Desiree's ability to parent BM, the trial court found Laura's and Almonte's testimony credible, but did not discuss Stephenson's testimony or credibility. The trial court did note that evidence of Desiree's drug use included photographs taken by Stephenson's daughter depicting "drug paraphernalia in the bathroom of [Desiree's] now former residence." VRP (June 13, 2019) at 476. However, the photographs were admitted under ER 904 and it was Laura who testified about the photo. We hold that the trial court made no errors regarding the consideration of Stephenson's testimony.

---

[3] Desiree also contends that the trial judge committed judicial misconduct by not referring Laura and Stephenson for prosecution for bribery. As explained above, the evidence did not show bribery occurred. Nor has Desiree established that the trial judge committed judicial misconduct. *See State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017).

II. NONPARENTAL CUSTODY DETERMINATION

A.    Nonparental Custody

"'[A] parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the [d]ue [p]rocess [c]lause of the Fourteenth Amendment.'" *In re Custody of L.M.S.*, 187 Wn.2d 567, 575, 387 P.3d 707 (2017) (quoting *Troxel v. Granville*, 530 U.S. 57, 77, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Souter, J. concurring)). However, "'[a]lthough the family structure is a fundamental institution of our society, and parental prerogatives are entitled to considerable legal deference, they are not absolute and must yield to fundamental rights of the child or important interests of the State.'" *In re Custody of Shields*, 157 Wn.2d 126, 142, 136 P.3d 117 (2006) (internal quotation marks omitted) (quoting *In re Marriage of Allen*, 28 Wn. App. 637, 646, 626 P.2d 16 (1981)).

Under RCW 26.10.030, nonparents may petition a court for custody of a child, but the constitution permits awarding custody to a nonparent only in extraordinary circumstances. *See, e.g.*, *L.M.S.,* 187 Wn.2d at 575-76. Nonparents may be awarded custody where the parent is unfit or where "actual detriment to the child's growth and development would result from placement with an otherwise fit parent." *Shields*, 157 Wn.2d at 143. To satisfy constitutional requirements, the burden is on the nonparent seeking custody to show unfitness or actual detriment. *C.D.*, 188 Wn. App. at 826. The unfitness or actual detriment test "'acknowledges the constitutional right to privacy implicated in custody disputes and . . . is sensitive to both a biological parent's rights and the needs of a child.'" *Id.* (quoting *In re Custody of Stell*, 56 Wn. App. 356, 365, 783 P.2d 615 (1989)).

The evidentiary standard applicable to unfitness or actual detriment findings in the nonparental custody context is a bit unclear, but at least one Washington court has applied the clear

and convincing evidence standard. *In re Custody of C.C.M.*, 149 Wn. App. 184, 205-06, 202 P.3d 971 (2009). The trial court here applied the clear, cogent, and convincing standard.[4]

We review a trial court's decision in a nonparental custody proceeding for manifest abuse of discretion. *C.D.*, 188 Wn. App. at 826. And we review the trial court's findings of fact for substantial evidence. *Id.* "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014)). If testimony conflicts, we defer to the trier of fact's determinations about the credibility of witnesses and the persuasiveness of the evidence. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). We may "not reweigh or rebalance competing testimony and inferences even if [it] may have resolved the factual dispute differently." *Bale v. Allison*, 173 Wn. App. 435, 458, 294 P.3d 789 (2013). Disputed evidence is still substantial if it is sufficient to persuade a reasonable person that it is true. *Id.* We "'are generally reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties.'" *C.D.*, 188 Wn. App. at 826 (quoting *Stell*, 56 Wn. App. at 366).

B.       Whether the Trial Court's Findings of Fact Are Supported by Substantial Evidence

Desiree challenges the trial court's findings of fact, arguing that they "were made without any, or very tenuous, legitimate evidence and therefore do not support the conclusions of law." Br. of Appellant at 18. We hold that the trial court's findings were supported by substantial evidence.

---

[4] The Washington Supreme Court has held that the standard of "clear, cogent, and convincing evidence" applies to findings of parental unfitness or actual detriment in termination proceedings. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

1.      Substance abuse

Desiree argues that the evidence did not support a finding that she had ever used drugs other than marijuana and that the trial court erred by finding that she had a long-term substance abuse problem.

Although Laura did not see Desiree using drugs, she testified that Desiree told her she used methamphetamine. Laura also testified that she found pills in Desiree's room after one of Desiree's visits with BM. Similarly, Almonte testified that Desiree had admitted using drugs and he saw her consume marijuana several times. Almonte also testified that he was familiar with the appearance of people who used drugs and Desiree had the features he associated with drug use, such as a gaunt and sunken face, skin conditions, dirty and greasy hair, bulging eyes, and a lack of cleanliness. Desiree was ordered to complete hair follicle and urinalysis drug tests more than once before trial but the record before this court contains only the results of one urinalysis, which was positive for marijuana. The court considered her hair follicle test to be positive because she failed to comply with the court's order to have the test. And Stephenson testified to using drugs with Desiree.

The trial court found Laura's and Almonte's testimony credible and concluded that "drugs, whether they're legal or illegal, are impairing both [parents'] abilities to perform parenting functions." VRP (June 13, 2019) at 476. We may not reweigh the trial court's credibility determinations or reweigh the evidence on appeal, even if we might not have come to the same conclusion. *In re Marriage of Bundy & Rush*, 12 Wn. App. 2d 933, 938, 460 P.3d 1111 (2020). And Laura's and Almonte's credible testimony, combined with Desiree's failure to comply with orders for drug tests, was sufficient for a rational fact finder to conclude that Desiree had a substance abuse problem that interfered with her parenting.

2.    Medical neglect

Desiree argues that the trial court erred by finding that she neglected BM's medical needs. Desiree contests the number of BM's doctor's appointments that she missed and contends that the evidence did not show that the length of time between medical appointments affected BM's treatments. We disagree.

Substantial evidence supports the trial court's finding that Desiree neglected BM's medical needs. BM's medical records show multiple missed appointments, despite the fact that BM's providers told Desiree and Millar that CTEV could only be treated properly if they brought BM to weekly appointments for serial casting. Dr. Rajacich repeatedly stated that the condition of BM's left foot had relapsed due to extended periods of time when she was not wearing her cast. Dr. Rajacich's notes indicate that even the progress made through surgical correction of BM's left foot had "essentially fail[ed]" because BM's "cast came off early and nothing was done about it." Ex. 5, at 252.

Desiree acknowledged gaps in care. She admitted that BM was wearing a brace only 25 percent of the time even though BM's doctors told her that BM should be wearing the brace full time. Desiree also sent BM to visit Laura in Arizona without packing the brace. The medical records show a five-month gap in treatment after BM's first surgery that Desiree did not dispute at trial. Finally, Desiree did not take BM to any pediatrician appointments during her first year.

Although Desiree argues that she missed only four appointments and that three of those missed appointments were because she was visiting Laura in Arizona, the evidence presented at trial contradicts this claim. The evidence also showed that BM's relapses were due primarily to the length of time between her appointments and the amount of time BM spent out of her casts and

braces, rather than some precise number of missed appointments. The trial court did not err by finding that Desiree neglected BM's medical needs.

       3.      <u>Refusal to perform parenting functions</u>

Desiree argues that the trial court erred by finding that she substantially refused to perform parenting functions. Desiree contends that the trial judge "offer[ed] no explanation as to what parenting functions" she refused to perform "other than the function of providing medical care for BM." Reply Br. of Appellant at 9. We reject this argument.

Under RCW 26.09.004(2)(b) and (e), the term "parenting functions" refers to a broad range of duties, including, "Attending to the daily needs of the child, such as . . . physical care and grooming, . . . health care," and "[e]xercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances." Because we affirm the trial court's factual finding that Desiree was medically neglectful, we hold that the trial court properly found Desiree failed to attend to BM's physical care, health care, and welfare under RCW 26.09.004(2)(b) and (e).

Moreover, Laura, Almonte, and Jean testified that Desiree was not able to provide BM with the basic necessities of life. Almonte testified that Desiree did not consistently have housing when she cared for BM, and he recalled that several places Desiree and BM stayed, including a boat, were unclean or unsafe for a toddler. Desiree was also unable or unwilling to arrange alternate transportation to doctor's appointments, even though her family offered rides any time. A reasonable trier of fact could find that Desiree failed to provide for BM's daily health needs and filed to exercise appropriate judgment regarding BM's welfare.

Substantial evidence supported the trial court's finding that Desiree substantially failed to perform her parenting functions as defined by RCW 26.09.004(2).

4. Chaotic living environment and housing, employment, and transportation instability

Desiree argues that substantial evidence did not support the trial court's finding that her living situation was chaotic and that she lacked stable housing, employment, and transportation. We disagree.

Almonte testified that Desiree did not have stable housing while BM lived with her. He stated, "Every time I dropped [Desiree] off or would bring her home, it would be a different place." VRP (June 12, 2019) at 210. Almonte also expressed concerns about the safety and hygiene of Desiree's temporary residences. He testified that Desiree and BM temporarily lived on a boat with a low railing that would not have prevented a toddler from falling into the water. Almonte also saw pet urine and feces on the floor of another house where Desiree and BM stayed.

Almonte testified that neither Desiree nor Millar was employed when BM lived with Desiree and he never knew Desiree to have steady employment. Similarly, Laura testified that she had never known Desiree to be steadily employed and that Desiree did not pursue the employment and educational opportunities she helped facilitate. At the time of the trial, Desiree testified that she worked painting parking lots but acknowledged that she was essentially self-employed, the work was sporadic, and she could not provide verification of her employment.

With regard to Desiree's access to transportation, both Laura and Almonte testified that Desiree did not have a car or a valid driver's license, relied on other people for rides, and did not take public transportation. Desiree acknowledged that car trouble prevented her from bringing BM to the doctor for over a month when BM needed weekly appointments and she did not try to find other transportation. Desiree also testified that she was unable to attend the first half of a planned visit with BM after Laura was granted temporary custody because Desiree did not have a car, could

not get a ride, and could not borrow a car long enough to make it to the visit. Desiree did not testify that she had gained access to reliable transportation at the time of trial.

Substantial evidence supports the trial court's finding that Desiree had a chaotic living environment characterized by long-term housing, employment, and transportation instability.

5.      Failure to Exercise Parental Judgment

Desiree argues that the trial court erred by finding her an unfit parent "simply because she defended herself against the false accusations made against her." Br. of Appellant at 2. We disagree.

Parental unfitness may arise where a parent fails to perform parenting functions, as defined by RCW 26.09.004(2). "[E]xamples of unfitness include the fault or omission by the parent seriously affecting the welfare of a child." *Shields*, 157 Wn.2d at 142-43.

The trial court found that Desiree was not able to perform parenting functions because she did not exercise appropriate parental judgment as required by RCW 26.09.004(2)(e). Substantial evidence also supports a finding that Desiree's poor parental judgment put BM's welfare at risk. *See id.* Desiree repeatedly failed to take BM to her medical appointments and made decisions that caused BM not to wear her medically necessary casts or braces for days and weeks at a time. Desiree failed to provide hygienic and safe housing for BM. To the extent the trial court also found that Desiree and Millar had not taken responsibility for poor parental judgment, there is no evidence that the trial court penalized Desiree for contesting Laura's nonparental custody action.

We hold that the trial court properly found that Desiree failed to exercise reasonable judgment as a parent and reject Desiree's argument that the trial court found her unfit merely because she contested Laura's petition for custody of BM.

18

C.    Finding of Actual Detriment

Desiree contends that the trial court erred by finding, in light of all of the facts discussed above, that BM would be detrimentally affected if left in Desiree's custody. She argues that the evidence was indicative only of her past conduct and not her current fitness. Additionally, Desiree asserts that BM's missed medical appointments could not support a finding of actual detriment because Dr. Rajacich wrote in a letter, not included in the record on appeal, that compliance would not have made a difference to BM's treatment. We disagree.

Under extraordinary circumstances, "parental rights may . . . be outweighed in custody determinations when actual detriment to the child's growth and development would result from placement with an otherwise fit parent." *Shields*, 157 Wn.2d at 143. The determination of actual detriment is a fact specific inquiry that must be decided on a case-by-case basis. *L.M.S.*, 187 Wn.2d at 576. The actual detriment test is a high bar to clear and will not be met merely by establishing that the nonparent can provide "'a superior home environment.'" *In re Custody of J.E.,* 189 Wn. App. 175, 185, 356 P.3d 233 (2015) (quoting *C.C.M.*, 149 Wn. App. at 204).

In *Allen*, Division Three affirmed the trial court's finding of actual detriment and affirmed a nonparental custody award to the child's stepmother. 28 Wn. App. at 639. The child was deaf and the father's sign language capabilities were minimal, while the stepmother and stepsiblings were fluent. *Id.* at 641. Division Three held that the child's "future development would be detrimentally affected by placement with his father" because the father's "inadequacy in sign language and lack of opportunities for interaction and communication would set back [the child's] intellectual development." *Id.* at 647.

In *Stell,* Division One reversed the trial court's award of custody to the father where the unrebutted evidence, including unanimous expert testimony, showed that the child's aunt could

provide a more stable and constructive home for the child. 56 Wn. App. at 358-63. The child had suffered physical and sexual abuse, and the trial court erred by concluding that the father could meet the child's serious need for therapy and stability. *Id.* at 358, 367-69. Thus, Division One reversed the trial court's finding that the child would not suffer actual detriment to his psychological development if he remained in the father's custody. *Id.* at 358.

In *C.D.*, Division Three affirmed the trial court's actual detriment finding, holding that "[p]lacing C.D. with either parent would detrimentally affect C.D.'s growth and development" because C.D. was emotionally and possibly physically abused by his parents, which caused him to be suicidal and exhibit other behavioral issues. 188 Wn. App. at 827. Division Three noted, "after C.D. was placed with his maternal aunt and uncle, he made significant gains toward recovery," but "[i]f returned to his father, C.D. has threatened to run away or kill himself." *Id.* The guardian ad litem and C.D.'s counselor "strongly recommended that C.D. remain in the care of his maternal aunt and uncle." *Id.* at 827-28. Division Three concluded that "[s]ubstantial evidence supports the trial court's finding that C.D. would be detrimentally affected if he was returned to either parent." *Id.* at 828.

Here, substantial evidence supports the trial court's understanding that BM had special medical needs and consistent diligent care was critical to avoid substantial harm. The evidence submitted at trial included Dr. Rajacich's repeated observations that BM's condition had relapsed, his concerns that additional surgeries would be needed, and his statement that he was not "entirely optimistic" that the progress lost through noncompliance could be regained. Ex. 5, at 252. Further, Laura testified that BM's doctor in Arizona "wanted to make sure that . . . we were fully aware of how serious the follow-up treatment was going to be at this point." VRP (June 12, 2019) at 327-28. Laura explained that the doctor told her that avoiding any lapses had become "absolutely

crucial to [BM] not having a future physical deformity . . . [or] a disability that wouldn't be corrected." *Id.*

The extraordinary circumstances necessary to find actual detriment exist here. Evidence presented at trial showed that BM would suffer actual detriment, including a potentially permanent physical disability, if her caretakers did not ensure absolute compliance with a strict treatment regimen. The evidence also showed a long pattern of the parents' failure to comply with necessary treatments and that Desiree's medical neglect had made BM more vulnerable to permanent damage. BM's need for a caretaker able to attend diligently to her CTEV treatments is similar to the communication needs of the deaf child in *Allen* and the psychological needs of the children in *Stell* and *C.D.* Here, as in those cases, the facts meet the high threshold for a finding of actual detriment. As in *Allen*, *Stell*, and *C.D.*, the evidence was sufficient to support a finding by clear and convincing evidence that BM had special medical needs and she would suffer actual detriment if returned to Desiree's custody.

Moreover, Desiree has not challenged the three-phase parenting plan that gives her the chance to remedy the specific parental deficiencies that underpinned the trial court's finding of actual detriment. Both Laura and the trial court acknowledged that Laura's nonparental custody of BM would cover the most crucial stages of BM's CTEV treatments and that Desiree may petition to regain custody of BM if she complies with the parenting plan requirements.

Desiree cites *In re Custody of ALD* for the proposition that the trial court improperly relied on evidence of her past conduct (missed medical appointments or her lack of compliance with casting and bracing) in deciding whether BM would face actual detriment in her custody. 191 Wn. App. at 474, 505-06, 363 P.3d 604 (2015). *ALD* is distinguishable because in that case the improperly relied upon past conduct predated the birth of the child. *Id.* at 477, 505. In contrast, the

evidence of Desiree's medical negligence began when BM was only a few months old and continued until Laura gained temporary custody less than a year before trial. Further, evidence at trial indicated that since the court granted temporary custody of BM to Laura, Desiree repeatedly arrived late for her visits with BM, was frequently distracted or not engaged with BM during the visits, and often became argumentative with Laura during in person and virtual visits. Desiree arrived late for a second surgery that BM had in February 2019. Desiree also disputed that the second surgery was medically necessary. Desiree's most current behavior supports the trial court's finding of actual detriment because it does not suggest she would be able to diligently follow a treatment regimen for BM.

We affirm the trial court's conclusion that BM would suffer actual detriment if she remained in Desiree's custody during this critical period in her treatment.

D.      Finding of Parental Unfitness

Desiree argues that the trial court erred by concluding that she was an unfit parent. She claims there were "no tenable grounds" for finding her parentally unfit. Br. of Appellant at 14-15. Desiree emphasizes that the trial court's finding of unfitness hinged on her past conduct rather than current fitness. We disagree.

"A parent is unfit if he or she cannot meet a child's basic needs." *L.M.S.*, 187 Wn.2d at 576. "[E]xamples of unfitness include fault or omission by the parent seriously affecting the welfare of a child," and failure to preserve "the child's right to freedom from physical harm, illness or death." *Shields*, 157 Wn.2d at 142-43. A court must focus on the *current* fitness of the parent, and a parent's past history is only one factor that may be considered when weighing a parent's current unfitness. *In re Dependency of Brown*, 149 Wn.2d 836, 841, 72 P.3d 757 (2003). Past conduct cannot be the sole factor supporting a finding of unfitness. *See id.*

As discussed above, substantial evidence supports the trial court's finding that Desiree was medically neglectful, which supports its conclusion that Desiree was an unfit parent. Desiree failed to comply with a treatment regimen for BM's CTEV at a critical stage when rigorous compliance was necessary to avoid additional surgical interventions and prevent lifelong disability. Desiree therefore failed to protect BM from physical harm. *See Shields,* 157 Wn.2d at 142-43. Desiree's medical neglect also constituted a substantial failure to perform parenting functions under RCW 26.09.004(2)(b) and (e). The evidence showed that Desiree failed to ensure BM received medically necessary treatment for her CTEV. The trial court's finding that Desiree was medically negligent thus constituted clear and convincing evidence of parental unfitness.

We reject Desiree's contention that the trial court erred by finding her unfit by relying on evidence of her past conduct rather than current fitness. For the same reasons the trial court did not improperly rely on Desiree's past conduct in finding actual detriment, Desiree's failure to comply with BM's treatment regimen in the preceding two years was not improper evidence. *See ALD*, 191 Wn. App. at 505. In addition, the parenting plan provided opportunities for Desiree to progressively cure her unfitness and regain custody of BM after meeting certain benchmarks, including compliance with a drug treatment program and proof of access to lawful transportation.

Desiree also argued that the trial court's finding of unfitness violated her fundamental, constitutional right to parent. However, the nonparent seeking custody must show that the parent is unfit or that the child will suffer actual detriment if left in the parent's custody, and the Washington Supreme Court has explicitly held that this test is constitutional because it "is sensitive to both a biological parent's rights and the needs of a child." *Stell*, 56 Wn. App. at 365. Because we conclude that sufficient evidence supports the trial court's finding that Desiree was unfit, and the unfitness test is constitutional, there was no constitutional error.

CONCLUSION

We affirm the trial court's conclusion that Desiree was unfit and that BM would suffer actual detriment if left in Desiree's custody. We thus affirm the trial court's award of nonparental custody of BM to Laura.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Worswick, P.J.

Cruser, J.