IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parentage of A.W. | ) | |
| | ) | No. 37607-9-III |
| CATHERINE HERRMAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JACOB WARNER, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Catherine Herrman appeals the trial court's entry of a final

parenting plan for her and Jacob Warner's daughter, A.W.,[1] under which Mr. Warner,

---

[1] To protect the privacy interests of minor children, this court identifies them only through the use of initials. General Order of Division III, *In Re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber =2012_001&div=III.

rather than Ms. Herrman, serves as the primary residential parent. For the first time on appeal, Ms. Herrman raises legal challenges to the procedure followed by the trial court. She also challenges the sufficiency of the findings and evidence to support the plan's residential provisions. Because she fails to demonstrate any preserved error and the findings and evidence are sufficient, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Catherine Herrman and Jacob Warner have a child together, A.W., who was born in late 2009. About a year and a half later, Ms. Herrman completed and filed a petition for establishment of parentage that identified Mr. Warner as A.W.'s alleged and presumed father. A temporary parenting plan was entered a few weeks later that identified Ms. Herrman as A.W.'s primary residential parent. Mr. Warner was given long weekend visitation every other week, with shortened weekends when A.W. started school. Because Ms. Herrman lived in Davenport and Mr. Warner lived in Moses Lake, Ritzville was designated as the pickup and drop-off location for visitation.

A second temporary parenting plan was entered in January 2015, when A.W. became enrolled in school. Ms. Herrman remained the primary residential parent.

The parties had some disagreements operating under the parenting plan thereafter, but the issue in this appeal was not presented until the summer of 2018, when Mr. Warner petitioned to change the parenting plan, proposing a residential schedule under which A.W. would reside primarily with him and he would have major decision making

authority. His petition was supported by declarations from Mr. Warner, his wife, his parents, and a close family friend. The declarations expressed concern about A.W.'s safety and well-being. All asserted a belief that A.W. was living with her maternal grandmother, Julie Lawson, rather than with Ms. Herrman. Ms. Herrman opposed the petition, filing a declaration of her own and one from Ms. Lawson.

After reviewing the submissions, the trial court entered an order finding adequate cause for a hearing to address whether A.W. was residing with her mother or grandmother.

Almost a year later, Mr. Warner filed a further declaration and a proposed parenting plan after he was contacted by Child Protective Services (CPS) and invited to attend a safety team meeting triggered by two incidents where Ms. Herrman's then 3-year-old son had walked away from Ms. Herrman's home. His declaration expressed heightened concern for A.W.'s health and safety. Mr. Warner's proposed parenting plan accused Ms. Herrman of neglect and child abuse. Ms. Herrman responded with her own declaration, evidently at a hearing held in August 2019. According to statements later made by the trial court, it was at the August 2019 hearing that it "told everyone that there's only a temporary parenting plan, there's no final parenting plan to modify," and they "need[ed] to set up a trial date for the final parenting plan." Report of Proceedings (RP) at 38-39.

3

The trial was conducted in March 2020. Mr. Warner was represented by counsel. Ms. Herrman appeared pro se. At the outset of the trial, the court again stated that Mr. Warner erred when he framed his petition as one for modification, because no final parenting plan was ever entered. Ms. Herrman told the court she thought she received something indicating that a final parenting plan was entered. She was unable to produce it, she said, because she was temporarily excluded from her apartment following damage from a fire.

Mr. Warner called Ms. Herrman as his first witness, after which he and his wife testified in support of his proposed parenting plan. Ms. Hermann provided testimony in the form of a statement to the court following Mr. Warner's case, and was her only witness.

In Ms. Hermann's direct examination, she was presented with school records revealing that A.W. was consistently performing poorly in school. The records also revealed that A.W. had more excused and unexcused absences than was admitted by Ms. Herrman, who had testified that A.W.'s attendance was "good." RP at 13. Ms. Herrman conceded that she had not attended A.W.'s parent/teacher conferences attended by Mr. Warner, but claimed it was because A.W.'s teacher held a separate conference with her. She did not recognize a breakdown of A.W.'s test scores that was offered by Mr. Warner

4

as exhibit R-101, saying she had never seen it.[2]  Mr. Warner identified it as a document given to him at the parent/teacher conference by A.W.'s teacher, who he said was "really concerned about her math[,] that she needs extra work at home."  RP at 51.

Ms. Herrman conceded that it was Ms. Lawson, rather than her, who handled the visitation handoffs in Ritzville, in part because Ms. Herrman and the Warners "don't get along."  RP at 25.  Ms. Herrman conceded that Ms. Lawson most often accompanied A.W. to A.W.'s doctor's visits.  She later explained that A.W.'s doctor in Davenport is Ralph Panke, "[a]nd I don't go to doctor appointments with Ralph Panke because Ralph Panke and I have a personal conflict."  RP at 65.

Ms. Herrman conceded during the trial that after being court-ordered to provide Mr. Warner with her telephone number the prior fall, "he got out of line and I changed my phone number."  RP at 67.  She discounted the requirement that Mr. Warner have the ability to contact her, stating that "it's just not necessary."  RP at 68.  She agreed that Mr. Warner has to "contact[ her] mom for everything."  *Id.*

Ms. Herrman denied that A.W. lived with Ms. Lawson, but conceded that the apartment she rented for herself, her two young sons, and, allegedly, A.W., had only two bedrooms.

---

[2] For the first time on appeal, Ms. Herrman questions the authenticity of exhibits admitted at trial.  We decline to review her unpreserved objections.  RAP 2.5(a).

Mr. and Ms. Warner testified to reasons they were convinced that A.W. was living with her grandmother rather than her mother. They included that A.W. had her own bedroom at Ms. Lawson's home that included a dresser for her clothing, and that whenever they had seen A.W. while in Davenport, it had always been at Ms. Lawson's home, and never at Ms. Herrman's apartment.

At the conclusion of the evidence and summations, the trial court announced from the bench that it would enter a final parenting plan under which Mr. Warner would be the primary residential parent, summarizing the evidence that supported its decision. Ms. Herrman appeals.

ANALYSIS

Ms. Herrman, represented by counsel on appeal, has filed an opening brief that contains no assignments of error as required by RAP 10.3(a)(4). It rarely cites to the record for the factual assertions in her statement of the case, as required by RAP 10.3(5). The brief does identify "issues presented," and given our preference to decide cases on the merits, *see* RAP 1.2(a), we will not reject the brief out of hand. We do impose sanctions of $100 on Ms. Herrman's counsel.

We first address Ms. Herrman's contention that the trial court conducted the trial under the wrong procedure. We then turn to the adequacy of the court's findings and the evidence in support.

I.     MS. HERRMAN'S CHALLENGES TO THE PROCEDURE FOLLOWED BY THE TRIAL
       COURT WERE NOT PRESERVED AND ARE NOT DOCUMENTED

The first issue presented by Ms. Herrman—that trial was conducted under the wrong procedure—suggests why she failed to make assignments of error: she never raised her legal objections during the trial, so there are no rulings to which she *can* assign error. For the first time on appeal, she contends (1) the 2011 petition for establishment of parentage was defective, (2) a February 2015 order consolidating this case with another case reveals that the second temporary parenting plan was made final, and (3) a final parentage order should be deemed a final residential placement under our Supreme Court's decision in *In re Parentage of C.M.F.*, 179 Wn.2d 411, 314 P.3d 1109 (2013).

A.     *The error in identifying Mr. Warner as a "presumed" parent was invited*

First, Ms. Herrman contends that the 2011 petition for establishment of parentage that commenced this proceeding was faulty because it listed Mr. Warner as a presumed parent. An individual is "presumed" to be a parent of a child only if the individual and the woman who gave birth to the child are married to or in a state registered domestic partnership with each other, and the circumstances identified by RCW 26.26A.115(1) are present. That was not the case here.

The petition is a handwritten completion of the mandatory family law "Petition for Establishment of Parentage" form, signed by Ms. Herrman. By all appearances, it was prepared by her. Either way, the identification of Mr. Warner as a "presumed" parent

was hers.  (Elsewhere in the petition, Mr. Warner is identified as an "alleged" parent, which is the case.  *See* CP at 3, 5; RCW 26.26A.010(3)).

We need not reach the fact that Ms. Herrman failed to preserve error under RAP 2.5(a), because this error was invited.  Under the invited error doctrine, a party cannot set up an error at trial and then complain of it on appeal.  *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995).

B.      *Ms. Herrman provides no evidentiary support for her contention that a consolidation order should be construed as finalizing the temporary parenting plan*

Ms. Herrman next contends that "[i]n February 2015, the court, on its own motion, consolidated two parentage cases and entered a note that the case was resolved, entering a Judgment and Order on Parentage from case number 13-5-00025-5."  Appellant's Opening Br. at 3.  She cites "CP 16" as the basis for this factual assertion, but page 16 of the clerk's papers is page 7 of the temporary parenting plan filed in September 2011.  It has nothing to do with case number 13-5-00025-5 or consolidation.

The words "consolidate" and "consolidated" do not appear anywhere in the clerk's papers.  The only mention of Lincoln County case number 13-5-00025-5 is by Mr. Warner, in his modification petition.  He attaches to his petition a February 6, 2014 final order of child support entered in that case, which was an action by the State of Washington against Mr. Warner.  *See* Clerk's Papers (CP) at 49-55.

Elsewhere, Ms. Herrman represents that the order of consolidation "filed under clerks papers 16 . . . references that in 2015 the court expected the parties to enter necessary findings of fact and conclusions of law, a Judgment and Order Determining Parentage and a final parenting [plan] with child support and worksheets to conclude the case in 2015" but she goes on to admit that "no final parenting plan, child support, or findings and conclusions were entered." Appellant's Opening Br. at 10-11. She represents that the court "entered a note on 2/4/15 stating 'case resolution Uncontested Resolution' which would appear to mean that the Petition on Parentage was finalized and the case was resolved." *Id.* at 11. Relying on her characterization of this alleged order and alleged note, she contends the trial court should have heard Mr. Warner's request as one to modify a final parenting plan.

Ms. Herrman never made these arguments in the trial court, despite knowing from the August 2019 hearing that the trial court viewed the issue presented by Mr. Warner as entry of a final parenting plan, not modification. RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them. *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). The reason for this rule is to afford the trial court an opportunity to correct errors as they are raised, thereby preserving the use of judicial resources. *Id*.

Even if we viewed Ms. Herrman as preserving error by stating at trial that she believed she received paperwork making the second parenting plan final—and we do

not—she would be required to identify the critical "paperwork" in the record or supplement the record with it. Neither the alleged order nor the alleged note on which she relies is part of the record.

"The party presenting an issue for review has the burden of providing an adequate record to establish such error, and should seek to supplement the record when necessary." *State v. Sisouvanh*, 175 Wn.2d 607, 619, 290 P.3d 942 (2012) (citation omitted). "Although this court may seek to supplement the record on its own initiative when appropriate, we may instead 'decline to address a claimed error when faced with a material omission in the record,' or we may simply affirm the challenged decision if the incomplete record before us is sufficient to support the decision, or at least fails to affirmatively establish an abuse of discretion." *Id.* (citations omitted) (quoting *State v. Wade*, 138 Wn.2d 460, 465, 979 P.2d 850 (1999)). This unpreserved, undocumented argument does not warrant consideration on appeal.

C.      *In re Parentage of C.M.F.*

Finally, Ms. Herrman contends that our Supreme Court's 2013 decision in *C.M.F.* is controlling authority that the trial court should have treated the order establishing Mr. Warner's parentage as a final parenting plan, and required Mr. Warner to demonstrate grounds for  modification.

In *C.M.F.*, the father's parentage was established by a final parentage order that clearly designated the mother as the child's custodian, subject to either party pursuing a

parenting plan. The father subsequently petitioned the court to enter a parenting plan. 179 Wn.2d at 416. The mother argued that by designating the mother as custodian, the order establishing the father's parentage was a "custody decree" within the meaning of RCW 26.09.260(1), which applies the heightened standards for modification of "a prior *custody decree* or a parenting plan." 179 Wn.2d at 419 (emphasis added and omitted). The court viewed the case as presenting an issue of statutory construction: the meaning of "custody decree." *Id.* at 421. Applying then-current statutes, the court held that a "custody decree" is an order that designates one parent a custodian for purposes of state and federal laws that attach significance to custodian status. *Id.* at 422. The order establishing C.M.F.'s parentage sufficed under that definition. *Id.* at 423.

In *C.M.F.*, not only did the mother raise a timely challenge to the procedure being followed by the court, she also presented the final parenting order on which she relied, which the Supreme Court held qualified as a custody decree. Here, the argument was not raised and the trial court was not given the opportunity to determine whether any order qualifying as a custody decree was ever entered. It appears that no *order* establishing Mr. Warner's parentage was needed; the record suggests that Mr. Warner's parentage was established through an acknowledgement of parentage instead. *See* CP at 150. We have no reason to believe that such an acknowledgment would qualify as a custody decree. Here, too, we will not review this unpreserved, undocumented issue.

II.    THE TRIAL COURT'S FINDINGS AND THE EVIDENCE ARE SUFFICIENT

Ms. Herrman's remaining assignments of error are to the sufficiency of the trial court's findings and the evidence. She contends the trial court did not make findings on factors it is required to consider in making final residential provisions for a child, which appear at RCW 26.09.187(3)(a). She specifically challenges the trial court's finding that the evidence strongly suggests A.W. was primarily living with her grandmother.

RCW 26.09.187(3)(a) provides that "[t]he court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances." It requires the court to consider seven exclusive factors. The first factor—"[t]he relative strength, nature, and stability of the child's relationship with each parent"—"shall be given the greatest weight." RCW 26.09.187(3)(a)(i), (vii).

If the trial court does not enter written findings addressing the residential factors, this court may review the trial court's oral ruling. *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981). When evidence of the factors is presented, thus making them available for consideration by the trial court and for review by an appellate court, specific findings are not required on each. *In re Marriage of Croley*, 91 Wn.2d 288, 292, 588 P.2d 738 (1978). "In [the] absence of evidence to the contrary, we assume the trial court discharged its duty and considered all evidence before it." *Id.* at 291.

12

A trial court's findings of fact are reviewed to determine if they are supported by substantial evidence. *In re of Custody of SA-M*, 17 Wn. App. 2d 939, 952, 489 P.3d 259 (2021). "Substantial evidence is evidence sufficient to persuade a fair and rational person of the truth of a premise." *Id.* In reviewing the evidence, we do not make credibility determinations and do not weigh the evidence presented at trial. *Id.* at 952. That is the province of the trial court, which enjoys the unique opportunity to personally observe the parties. *Id.* (citing *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989)). Instead, we view the evidence in the light most favorable to the prevailing party—here, Mr. Warner. *Id.* Stated differently, we assume that the evidence supporting Mr. Warner's position was viewed as more credible and entitled to more weight. "If there is substantial evidence to support a finding, it does not matter if there is contradictory evidence in the record." *Id.*

The trial court delivered a lengthy oral ruling in which it outlined the evidence presented by the parties. Its overarching concerns appear to have been that Ms. Herrman had unilaterally concluded that (1) she did not need to communicate with Mr. Warner, and, (2) having been given the primary residential role under the temporary orders, she had the prerogative of turning that over to Ms. Lawson. The trial court incorporated all of its oral findings in its written order, which emphasized, "Mother deferred her parenting responsibilities to maternal grandmother including residential care, communication with Father and all transportation." CP at 151.

13

While the trial court did not call out each of the residential factors for discrete analysis when ruling orally, it did make findings to support most of them.

As to factor one, "the relative strength, nature, and stability of the child's relationship with each parent," RCW 26.09.187(3)(a)(i), the trial court found that both parents "get a long . . . well" [sic] with A.W.  RP at 91.  More importantly, however, it commented on the extent to which Ms. Herrman had abdicated her role to A.W.'s grandmother.  It identified the evidence that "strongly suggests that the child [is] primarily living with the grandmother."  RP at 86.  It was troubled that "all communications, medical, dental, activities, everything seems to go through the grandmother," characterizing Ms. Lawson as "a de facto parent."  *Id.*  Ms. Herrman would like us to view the evidence in the light most favorable to her, but we do not.  Viewing the evidence in the light favorable to Mr. Warner, here *was* strong evidence that A.W. primarily resided with her grandmother.

In challenging this finding, Ms. Herrman also cites two cases, but neither is relevant.  She cites *In re Marriage of Lemke*, 120 Wn. App. 536, 85 P.3d 966 (2004), but that case involved a petition for modification, in which the father was required to show that for the mother to leave the parties' children with their maternal grandmother was detrimental to their physical, mental, or emotional health.  The mother in that case relied on the grandmother for child care only when work took her out of town, and this court observed that the evidence "[did] not show, or even suggest, that [the grandmother]'s

14

home is detrimental to the children." *Id.* at 541. In this case, by contrast, not only was Mr. Warner not required to show a detrimental effect on A.W., but the trial court did not view Ms. Herrman as enlisting her mother's help in only limited, necessary circumstances. It viewed her as unilaterally substituting her mother as a de facto parent.

Ms. Herrman also cites *In re Marriage of Chandola*, but that decision reversed a trial court's order that a father's parents be present for no more than 20 percent of the father's residential time. 180 Wn.2d 632, 653, 327 P.3d 644 (2014). Mr. Warner never sought to restrict A.W.'s time spent with her grandmother during Ms. Herrman's residential time, nor did the trial court impose any limit.

The trial court's oral ruling reveals that it viewed this factor as favoring Mr. Warner.

As to factor two, "[t]he agreements of the parties, provided they were entered into knowingly and voluntarily," RCW 26.09.187(3)(a)(ii), the trial court noted that as Ms. Herrman testified, the court had directed her to give Mr. Warner her telephone number so that the parties could communicate about A.W.'s well-being. The court was critical of Ms. Herrman's unilaterally cutting off communications with Mr. Herrman because she did not like his text messages, and without seeking the court's permission to cease complying with that part of its order. Ms. Herrman does not dispute that she agreed to exchange phone numbers and then unilaterally made it impossible for Mr. Warner to

contact her directly. The trial court's oral ruling reveals its view that this factor favored Mr. Warner.

As to factor three, "[e]ach parent's past and potential for future performance of parenting functions . . . including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child," RCW 26.09.187(3)(a)(iii), the trial court commented on proof that Mr. Warner attended parent/teacher conferences. It was skeptical of Ms. Herrman's testimony—her only evidence—that she attended separately-conducted parent/teacher conferences, observing that documentary evidence contradicted her testimony about how A.W. was doing in school, and Ms. Herrman had never seen a record of the sort provided to Mr. Warner during such a conference.[3] It expressed concern about A.W. having accumulated seven and a half excused and unexcused absences from school during the last quarter, noting that Ms. Herrman had testified that A.W. was in "perfect health." RP at 83. It observed that the fact that A.W.'s grandmother takes her to the doctor because Ms. Herrman and the doctor do not get along was "a little unique itself," and further evidence that the mother had tasked the grandmother as "the de facto parent . . . for the mother." RP at 89.

---

[3] In a declaration earlier filed by Ms. Herrman, she admitted missing a parent/teacher conference, but attributed it to an auto accident and testified she had asked her mother to attend.

The court commented on Mr. Warner's testimony that once he became aware of A.W.'s interest in soccer, he—being a soccer player himself—had become a local soccer referee. Ms. Herrman accused Mr. Warner of causing A.W. to miss volleyball meets, but Mr. Warner explained that A.W. had missed only one, during a weekend visitation. He testified that it was only a school tournament, not an extracurricular team, and he texted Ms. Lawson to let her know that A.W. did not want to return to Davenport for it. The trial court expressed the view that "the parent's relationship with the child is more important than a ten-year-old's missing a volleyball game unless there's something unique about the situation." RP at 88.

The parties testified to disagreements and misunderstandings about a couple of medical and dental issues and Mr. Warner testified that CPS had notified him about a concern for A.W.'s health. The trial court did not view the health issues themselves as serious concerns, but did express concern that information was not being shared under the current residential placement. In response to Ms. Herrman's interjection that the CPS case was closed with A.W. remaining in her care, the court commented, "[M]ost people don't get a [CPS] referral in the first place." RP at 87.

The court's oral ruling reveals that it viewed this factor as favoring Mr. Warner.

As to factor four, "[t]he emotional needs and developmental level of the child," RCW 26.09.187(3)(a)(iv), we repeat the trial court's findings that Mr. Warner demonstrated that he cared about and informed himself about how A.W. was doing in

school, while Ms. Herrman was disengaged. The court also found that A.W. had her own bedroom in the Warners' two-bedroom home, and the Warners were looking for a three bedroom home to accommodate the couple's new baby. Its comments indicate that the court viewed this factor as favoring Mr. Warner.

As to factor five, "[t]he child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities," RCW 26.09.187(3)(a)(v), the trial court found Mr. Warner had a lot of family support with his mother and father, three brothers, and nephews and nieces. The court also found Ms. Herrman had family support because her mother lived nearby. The court's ruling indicates that it viewed this factor as neutral.

The subject matters addressed by factors six and seven were not touched on by the trial court during its oral ruling, arguably because they were undisputed. As earlier observed, specific findings are not required on each factor. As to factor six, "[t]he wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule," RCW 26.09.187(3)(a)(vi), it can be inferred from the evidence in the record that Ms. Herrman wanted to continue with the temporary parenting plan, while Mr. Warner wanted primary custody of A.W.

As to factor seven, "[e]ach parent's employment schedule, [with] accommodations consistent with those schedules," RCW 26.09.187(3)(a)(vii), the declarations submitted

to the court made repeated references to Mr. Warner's employment as a manager at the Moses Lake Walmart. While no *evidence* was presented as to whether Ms. Herrman was employed, she repeatedly told the trial court that it was difficult for her to participate in visitation exchanges or prepare for and participate in the trial because she was a full-time parent to her four- and one-year-old sons.

We are able to determine from the trial court's oral ruling that it considered the evidence presented by the parties under the relevant statutory factors, and that substantial evidence supported its findings. Ms. Herrman's arguments from evidence viewed in the light most favorable to her are unavailing.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.

19