# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Guardianship of:<br><br>J.S.<br><br>Minor child. | No. 58967-2-II<br><br>PUBLISHED OPINION |

LEE, J. — J.L. appeals the superior court's findings and order appointing his father and stepmother as guardians of J.L.'s daughter, J.S. J.L. also appeals numerous emergency minor guardianship orders, the superior court's order denying J.L.'s motion to revise the commissioner's emergency minor guardianship orders, and the superior court's denial of J.L.'s motion to dismiss the guardianship action. Specifically, J.L. contends that the superior court commissioner's failure to hold a show cause hearing within five days of the filing of the emergency minor guardianship petition, as required by statute, violated his right to due process and that the commissioner erred in appointing his father and stepmother as emergency guardians of J.S. J.L. also argues that the superior court's decision to appoint his father and stepmother as full guardians of J.S. lacked substantial evidence.

Because there is no longer an emergency minor guardianship in place and because the superior court held a full guardianship trial, J.L.'s challenges pertaining to the emergency minor guardianship orders are moot. Additionally, because substantial evidence in the record supports a finding that J.L. is unable to perform parenting functions, the superior court did not err when it appointed J.L.'s father and stepmother as full guardians of J.S. We affirm.

FACTS

A.   BACKGROUND

1.   Early Months

J.S. was born to J.L. and K.S. in October 2019. When J.S. was three months old, J.L.—then aged 19—was awarded sole custody of J.S.

For the next several months, J.L., J.S., and J.L.'s then girlfriend, Katelyn, lived in and around Spokane in various homes. Initially, they lived with J.L.'s mother, Crystal. Then, with Crystal, they moved in with J.L.'s uncle. After a few months at his uncle's home, J.L., J.S., Katelyn, and Crystal left, and again lived together. During this time, J.L. did not work. According to Katelyn, J.L. would forget to feed J.S. or change her diapers, J.L. refused to bathe J.S., and J.L. often left J.S. unattended while he played video games or smoked marijuana.

When J.S. was approximately 10 months old, J.L., J.S., and Katelyn moved to the home of J.L.'s grandmother, Terisia, in Toledo, Oregon. The three lived with Terisia through J.S.'s first birthday. Then, in November 2020, J.L., J.S., and Katelyn left Toledo, returned to Spokane, and moved in with Katelyn's mother, Melody. Accounts differ as to why exactly J.L., J.S., and Katelyn left Terisia's home, but the record suggests that J.L.'s grandparents were frustrated with J.L.'s failure to care for J.S. and did not wish for him to continue living there.

While living with Melody, J.L. did not attend to J.S.'s needs. J.L. did not work. J.L. regularly smoked marijuana, played games on his phone, and left J.S. unattended. In many instances, Melody returned home from work to find that J.S. had soaked through her diapers, and it was evident that J.S.'s diaper had not been changed for hours. Melody witnessed J.L. change diapers only when Katelyn pressured him to do so. Melody began stopping at home during the

workday on her breaks to ensure J.S.'s diaper was changed. J.L. failed to dispose of dirty diapers and left them in the bedroom he shared with J.S. J.L. did not bathe J.S. and bathed only once himself over a period of a couple months. J.L. rarely interacted with J.S., and typically, it was Katelyn or Melody who would put J.S. to bed. While J.L. claimed he sought to have "an equal parenting-ship" with Katelyn, according to Melody, J.L. would abdicate responsibility and expect Katelyn or others to provide care for J.S. 2 Verbatim Rep. of Proc (VRP) (Sept. 25, 2023) at 879.

Melody did not allow J.L. to smoke marijuana inside her house. While J.L. would smoke outside, he did so on Melody's patio and left marijuana paraphernalia both inside the house and on the patio. On one occasion, Melody and J.L. fought over J.L.'s marijuana usage, his failure to contribute to the household, and his failure to take care of J.S. J.L. screamed and cursed at Melody and threatened to call the police. Melody told J.L. he was no longer welcome in her home, but Katelyn and J.S. were welcome to stay. J.L., J.S., and Katelyn left and moved in with J.L.'s father, Kie, and Kie's long-term partner, Kelly, in Silver Lake.

When J.L., J.S., and Katelyn arrived at Kie and Kelly's home, J.L. drove a vehicle without a license, car insurance, or valid registration tabs. J.L. lived with Kie and Kelly for a month and a half. During that time, Kie, Kelly, and Katelyn all worked. J.L. had difficulty obtaining a job, so every morning, someone from the household would drop J.L. off at a temp agency and pick him up in the evening. However, Kie and Kelly subsequently learned from the temp agency that J.L. had stopped working there even though family members had continued to drop him off at the agency. Kie and Kelly then discovered that after J.L. was dropped off at the temp agency, he would instead go to a friend's home to "hang out." VRP (Aug. 31, 2023) at 441. J.S. remained at home in the care of another family member.

3

On days J.L. was at home, J.L. never changed J.S.'s diapers, never gave J.S. a bath, and often slept in until late morning, leaving J.S. alone in her crib. J.L. frequently smoked marijuana at the house, even though Kie and Kelly did not allow marijuana at their home. J.L. would delegate J.S.'s care to Katelyn or leave J.S. unattended. Kie and Kelly provided food, and Kelly took J.S. to doctor appointments. Kelly potty-trained J.S.

A week or two after J.L. and J.S. came to live in Silver Lake, Kelly, who possesses a degree in early childhood education, noticed that J.S. was developmentally delayed. Specifically, Kelly noticed an issue with J.S.'s hearing and that J.S., at 18 months old, could not speak any words. Other family members also noticed the same issues. Kelly urged J.L. to take J.S. to be evaluated, but J.L. never did. Despite the fact that J.S. could not speak, J.L. did not believe J.S. had any developmental delays.

In June 2021, after Kie and Kelly discovered J.L.'s dishonesty about working, they asked J.L. to move out. Kie and Kelly offered to take J.S., and J.L. agreed. J.L. and Kelly signed a "Temporary Guardianship Affidavit," a document they found online, granting Kelly guardianship of J.S. for six months. Clerk's Papers (CP) at 14. J.L. and Kelly had the document notarized, and Katelyn and Kelly's daughter, Taylor, served as witnesses.

J.L. decided he wanted to go to Terisia's home, so Kie and Kelly bought J.L. a train ticket, gave him some cash, and told him that he could call or come see J.S. at any time. J.L. then moved in with Terisia.

2.     J.S.'s Development

After J.L. moved out, Kelly sought medical care for J.S. and an evaluation to assess potential developmental delays. J.S. was behind on her vaccinations and had severe fluid buildup

behind her ears, which caused her to be nearly deaf. As a result, J.S. had not developed language skills typical of a child her age. J.S. needed surgery on her ears to relieve the fluid buildup and had myringotomy tubes[1] placed. Kie notified J.L. of J.S.'s need for surgery. However, J.L. did not express any interest in or make further inquiries regarding J.S.'s surgery, nor did he go to the hospital for the procedure.

Kelly enrolled J.S. at the Progress Center, an organization that assists children with meeting developmental milestones. The Progress Center provided Kelly with tools to help J.S. reach those milestones.

Kelly actively worked with J.S. on developmental skills every day. For instance, Kelly talked with J.S. about foods during mealtimes, discussed colors, and ensured J.S. would look at family members in the face so J.S. could learn to read lips. Kelly also enrolled J.S. at the Wee Care Daycare and Preschool, where Kelly worked.

After six months, the Progress Center determined that J.S. was developmentally on track and could maintain her normal preschool schedule without additional assistance. Those around J.S. noticed J.S.'s significant improvement after Kelly became J.S.'s guardian.

3.     No Contact Order

Two weeks after J.L. moved out, Kie and Kelly hosted a graduation party for Holley, J.L.'s sister. While Kelly prepared for the party, she left J.S. in J.L.'s care. Kelly later discovered J.S. alone in the living room, and Kelly could not find J.L. Kelly called J.L. and learned that he had

---

[1] Myringotomy tubes are small tubes, surgically placed in an ear to assist with draining fluid. *Pediatric Myringotomy Tubes (Ear Tubes)*, CHILDREN'S NAT'L, https://www.childrensnational.org/get-care/health-library/myringotomy-tubes (last visited July 25, 2025).

left the house without notifying anyone. Kelly became upset and told J.L. that he could not "pick and choose when he wants to be a father." VRP (Aug. 31, 2023) at 468. J.L. hung up on Kelly.

J.L. returned to Kie and Kelly's house, and confronted Kelly. J.L. began yelling "vulgar names" at Kelly, and Kelly asked him to leave. VRP (Aug. 31, 2023) at 469. J.L. then punched Kelly in the mouth.

Terisia, Katelyn, and Taylor were all present when J.L. punched Kelly. Immediately after the punch, Katelyn and Taylor tackled J.L. Terisia stepped in and separated Katelyn, Taylor, and J.L. Terisia then drove away with J.L. while Taylor called the police. J.L. was subsequently arrested for the incident, but the case was later dismissed.[2]

As a result of the incident, Kelly obtained a no-contact order (NCO) against J.L., which prohibited J.L. from contacting her or coming within 1,000 feet of Kie and Kelly's home. Kelly was the only individual listed on the NCO, and the NCO did not apply to J.S., Kie, or anyone else in the family, or any other location. According to Kie, it was his and Kelly's intention that J.L. could still come visit J.S. without Kelly present.

Kie and other family members and friends would reach out to J.L. with photos and updates regarding J.S., but J.L. never engaged. While the NCO was in place, J.L. never attempted to visit J.S., nor did he request information about J.S.'s wellbeing or education. J.L. never provided any financial assistance for J.S.'s care. Additionally, J.L. did not request J.S.'s return when the six months of the Temporary Guardianship Affidavit expired in January 2022.

---

[2] There is no record on appeal that explains why the case was dismissed.

The NCO expired in August 2022. Then, on October 1, 2022, J.L. contacted Kie and Kelly and informed them he was in town with Terisia and that he intended to pick up J.S. J.L. did not provide any notice of his arrival, and he had not seen J.S. in over a year. When J.L. arrived to pick up J.S., Kie, Kelly, Terisia, and J.L. agreed that J.S. could spend the night with J.L. and Terisia at their hotel, but J.S. would otherwise remain with Kie and Kelly while she and J.L. re-established a relationship.

B.    PROCEDURAL HISTORY

1.    Petitions Filed and Initial Hearings

On October 4, 2022, Kie and Kelly filed an emergency minor guardianship petition,[3] requesting to be appointed as emergency guardians for J.S. Kie and Kelly asserted that to remove J.S. from the only home she had known and to place J.S. with J.L., whom J.S. had not seen in over a year, would be highly damaging to J.S. Kie and Kelly expressed concern that J.L. was not equipped to provide care for J.S. based on his unstable housing situation and his inability to anticipate a young child's needs. The trial court entered an order appointing Kie and Kelly as limited guardians and set a hearing for October 6.

On October 6, Kie and Kelly appeared before the superior court commissioner. The commissioner inquired if they had been able to serve J.L. with the emergency petition. Kelly responded that they had attempted to serve him, but J.L. had not been "forthcoming" with his current address. VRP (Oct. 6, 2022) at 9. Consequently, the commissioner extended the order

---

[3] Kie and Kelly subsequently filed an amended emergency minor guardianship petition on October 6, 2022.

appointing Kie and Kelly as limited guardians and put the matter over for two weeks to allow for service to be made on J.L.

On October 20, Kie, Kelly, and J.L. appeared before the commissioner. J.L. objected to the emergency minor guardianship petition. J.L. also filed several declarations and requested that an attorney be appointed to represent him. Kie and Kelly had not received copies of J.L.'s filings.

The commissioner acknowledged J.L.'s right to have an attorney appointed upon request, but the commissioner noted that the lack of available attorneys in Cowlitz County may cause a delay in appointing J.L. an attorney. To account for the delay, the commissioner again extended the order appointing Kie and Kelly as limited guardians and put the matter over until November 3 to allow for time for an attorney to become available for J.L. and for Kie and Kelly to receive J.L.'s filings.

Kelly requested the appointment of a Guardian ad Litem (GAL) for J.S. The commissioner determined that appointment of a court visitor, rather than a GAL, was appropriate at the time. The commissioner entered an order appointing Sherri Farr[4] as the court visitor.

J.L. also requested weekend custody of J.S. before the November 3 hearing, in part because he resided in Oregon and it was a several hour drive to Kie and Kelly's residence in Silver Lake. Kelly did not oppose visitations but objected to overnights because J.S. had only seen J.L. once or twice over the course of the last year and a half. Kelly also noted she and Kie had "left it open to [J.L.] to come see [J.S.] anytime he wants to, to do video calls anytime he wants to, and he ha[d]

---

[4] Farr was later appointed as the GAL.

8

not taken [them] up on that offer." VRP (Oct. 20, 2022) at 18. The parties agreed to Saturday visits between J.L. and J.S., with video calls on Tuesdays and Thursdays.

On December 2, Kie and Kelly filed a minor guardianship petition, alleging that there is no parent for J.S. who is willing or able to provide for J.S.'s support, care, education, health, safety, and welfare. The guardianship petition identified the emergency minor guardianship petition filed on October 4.

2. Extensions

Between November 2022 and July 2023, the parties participated in 12 hearings. At each hearing, the matter was continued[5] for various reasons, including to allow for notice of the hearings to J.S.'s biological mother[6]; to appoint attorneys for J.L., Kie, and Kelly; and J.L.'s delays in providing information to the court.

During the same time period, J.L. continually requested expanded visitation hours with J.S.—specifically, overnight visitations on weekends because he lived hours away in Oregon and the expense of driving and finding accommodation near Kie and Kelly was burdensome. However, J.L. was not forthcoming about his residence and, for months, failed to coordinate a video walkthrough with Farr to assess the safety of his home. When J.L. finally did coordinate a video walkthrough of his residence with Farr, J.L. informed Farr during the video meeting that the location he was showing her—his girlfriend's home in Silverton, Oregon—was not where he

_____

[5] With each continuance, the commissioner entered amended immediate orders granting limited guardianship of J.S. to Kie and Kelly.

[6] J.S.'s mother, K.S., is not a party to these proceedings, nor is there any dispute that she has relinquished parental custody rights.

9

actually intended to live with J.S. and he only "temporarily" resided there. VRP (Jan. 19, 2023) at 60. J.L. informed Farr that he intended to live with J.S. at Terisia's home in Toledo. Then, for months, J.L. again failed to coordinate a video walkthrough with Farr of Terisia's house. When J.L. finally did coordinate a video walkthrough of Terisia's house, Farr noted that the yard was filled with junk and was unsafe for a toddler. Additionally, J.L. failed to disclose that his girlfriend's son, who lived at the same Silverton residence where J.L. "temporarily" resided with his girlfriend, was a registered sex offender who had been convicted of rape of a child.

During J.L.'s allowed visitations with J.S., J.L. always brought either his girlfriend or Terisia along with him. Terisia or J.L.'s girlfriend, instead of J.L., provided the care and parenting for J.S. during these visits. J.L. would often cut short his in-person visits with J.S. or fail to show for phone visits without explanation or advance warning. Over the previous two-year period, J.L. had not spent more than five hours alone with J.S. J.L. often arrived unprepared to his in-person visits, and it was Kelly who provided J.S. with a bag or backpack of supplies.

J.L. allegedly took a four-hour online parenting course; however, he never provided information about the course or what he learned after Farr inquired about it. The parenting class that J.L. took turned out to be a course on how to parent children in families going through divorce. J.L. stated he took the course, but he "didn't know it was supposed to be for divorced children." 2 VRP (Sept. 25, 2023) at 996.

Kie and Kelly also hoped that J.L. would participate in counseling, such as for mental health, substance abuse, and domestic violence. J.L. refused to participate in any counseling or evaluations unless Kie and Kelly paid for them; however, J.L. never reached out to Kie or Kelly to ask for financial assistance for such programs. J.L. was often unresponsive to Farr and failed

to answer inquiries Farr made regarding whether J.L. had identified childcare options for J.S. in Toledo, a doctor for J.S., and if J.L. was looking for a job closer to where he intended to live.[7]

At each hearing, the commissioner revisited J.L.'s visitation schedule. The commissioner added Sunday in-person visits. The commissioner noted continued concerns over J.L.'s ability to care for J.S., but also suggested opportunities to J.L. that would prove his ability, including increasing J.L.'s responsibilities during in-person visits, such as feeding J.S. dinner, spending time with J.S. alone, and increasing communication with Farr, Kie, and Kelly.

On May 5, 2023, the commissioner held an evidentiary hearing on the emergency minor guardianship petition. The parties were unable to finish presenting their case, so the hearing was continued to May 17. However, the commissioner failed to enter an order extending Kie and Kelly's limited guardianship of J.S. The commissioner then retired, and the court struck the hearing date without resetting it before another commissioner.[8]

3.      Motion to Dismiss and Emergency Guardianship Hearing

On July 14, 2023, J.L. filed a motion to dismiss the guardianship action and for the immediate return of J.S. to his custody. J.L. argued in part that all immediate orders extending Kie and Kelly's limited guardianship of J.S. had expired, and that no emergency, as contemplated by the emergency minor guardianship statute, existed.

---

[7] J.L. worked three minutes from his girlfriend's home in Silverton. Terisia's house in Toledo is approximately 90 miles away.

[8] Between May 5 and July 11, the parties appeared in court five additional times to discuss expanded visitation for J.L., scheduling the full guardianship trial, and other motions not pertinent to the issues on appeal.

On July 18, the parties appeared before a new commissioner. At the hearing on J.L.'s motion to dismiss, the new commissioner noted the current procedural status of the case, including the irregularities with continuances and confusion with the retirement of the prior commissioner. Based on the fact that the parties had not completed the emergency minor guardianship evidentiary hearing, the commissioner denied J.L.'s motion to dismiss. The commissioner ruled that the parties would move forward with an emergency minor guardianship hearing to be followed by a full guardianship trial.

On July 25, the commissioner held the hearing on the emergency minor guardianship petition. The commissioner expressly stated that the hearing was for the emergency petition only and that the full guardianship petition had been set for trial in August 2023.

During the hearing on the emergency minor guardianship petition, Kie and Kelly argued that J.L. did not have the ability to prevent substantial harm to J.S. based on J.L.'s neglect of J.S. during her infancy; J.L.'s unstable housing situation; J.L. living in the same home as a registered sex offender; J.L.'s unlikely move to Terisia's house based on his job, which was in Silverton near his girlfriend's home where J.L. actually lived and 90 minutes away from Terisa's house; J.L.'s inability to even care for himself; and J.L.'s failure to take affirmative steps to demonstrate an interest in and awareness of J.S.'s needs. J.L. argued he had the ability to properly care for J.S., that he planned to move to Terisia's home as soon as he had custody of J.S., and that he would never take J.S. to his girlfriend's home. J.L. again requested dismissal of the guardianship action.

The commissioner granted the emergency minor guardianship and appointed Kie and Kelly as emergency guardians. In its oral ruling, the commissioner cited to RCW 11.130.225[9] and stated its reasons for granting the emergency minor guardianship petition, including J.L.'s "lack of self-awareness" regarding J.S.'s needs, J.L.'s unwillingness to engage in mental health and domestic violence evaluations, and J.L.'s living arrangements. VRP (July 25, 2023) at 392.

J.L. moved for revision of the commissioner's order appointing Kie and Kelly as emergency guardians. J.L. argued that there was insufficient evidence presented to show the requirements to appoint emergency guardians had been met and that the commissioner improperly considered inadmissible evidence. The superior court denied J.L.'s motion for revision.[10]

4.      Trial

The superior court then held a three-day trial on the minor guardianship petition. Several witnesses testified consistent with the facts described above, including J.L., Kie, Kelly, Farr, and Terisia, among others.

---

[9] RCW 11.130.225(1) provides in pertinent part:

[T]he court may appoint an emergency guardian for the minor if the court finds:
        (a) Appointment of an emergency guardian is likely to prevent substantial harm to the minor's health, safety, or welfare; and
        (b) No other person appears to have authority, ability, and the willingness to act to prevent substantial harm to the minor's health, safety, or welfare.

[10] The motion for revision of the commissioner's order appointing Kie and Kelly as emergency guardians in July 2023 was timely filed; however, the superior court did not enter its order denying the motion until October 3, 2023, citing the fact that a trial on the guardianship petition had already been held, and a minor guardianship had already been granted in September 2023, as the reasons for denial of the motion.

Following trial, the superior court appointed Kie and Kelly as full guardians of J.S. The superior court found that clear and convincing evidence showed J.L. was "not able to make decisions and perform functions that are necessary for the care and growth of J.S." 3 VRP (Sept. 29, 2023) at 1096. In its oral ruling, the superior court provided extensive reasoning, pointing to evidence such as J.L.'s lack of financial support for J.S., J.L.'s unstable housing, J.L.'s apparent disinterest in J.S. and cancelled visitations, and concerns about J.L.'s credibility and judgment. The superior court also cited the standards it applied for the guardianship trial—specifically, RCW 11.130.185, RCW 26.09.004, and RCW 11.130.240.

> In the written minor guardianship findings and order, the superior court stated:
>
> The approval [of the guardianship] is based on the following facts: [J.L.] displayed a pattern of abdicating parental responsibilities to others, particularly women in his life. He provided minimal financial support for [J.S.'s] daily needs despite having the means to contribute more. [J.L.'s] ongoing use of marijuana raised concerns about his motivation and ability to fulfill parental responsibilities. An incident of violence involving [J.L.] at a graduation party shortly after he left [J.S.'s] home raised concerns about his emotional regulation and ability to handle stressful situations. He had a history of housing instability, frequently moving between difference residences, which raised doubts about his ability to provide a stable living environment. Concerns arose regarding [J.L.'s] communication and his failure to disclose important information about his living situation to relevant parties. Despite having a bond with [J.S.], there were concerns about [J.L.'s] tardiness to visits and the presence of other individuals during visitation. He lacked involvement in [J.S.]'s education, including failure to inquire about her progress at daycare. Based on these facts, the court finds that [J.L.] was willing but not able to exercise the necessary parenting functions for [J.S.'s] care and growth, leading to the decision to appoint a guardian for [J.S.].

CP at 236.

The superior court entered its findings and order on the minor guardianship on December 22, 2023.

J.L. appeals.

14

No. 58967-2-II

ANALYSIS

J.L. argues that the superior court commissioner violated his right to due process when it continually extended the immediate emergency orders for eight months without an evidentiary hearing, the superior court erred when it appointed Kelly and Kie as emergency guardians, and the superior court's decision to appoint Kelly and Kie as full guardians lacked substantial evidence. We disagree.

A.    EMERGENCY GUARDIANSHIP PETITION

1.    Legal Principles

RCW 11.130.225 addresses emergency minor guardianships. RCW 11.130.225(1) provides:

> On its own, on motion when a guardianship petition is filed under RCW 11.130.190, or on petition by a person interested in a minor's welfare, including the minor, the court may appoint an emergency guardian for the minor if the court finds:
> (a) Appointment of an emergency guardian is likely to prevent substantial harm to the minor's health, safety, or welfare; and
> (b) No other person appears to have authority, ability, and the willingness to act to prevent substantial harm to the minor's health, safety, or welfare.

A court may appoint an emergency guardian for no more than 60 days and may extend the emergency guardianship once for up to an additional 60 days. RCW 11.130.225(2). Nevertheless, a court may extend an emergency guardianship beyond the 120-day maximum "pending the outcome of a full hearing under RCW 11.130.190 [petition for appointment of guardian for minor] or 11.130.220 [standby guardian for minor]." RCW 11.130.225(7).

Prior to a hearing on the emergency petition, reasonable notice must be provided to each parent of the minor. RCW 11.130.225(3)(c). A court may appoint an emergency guardian without

15

notice and a hearing "only if the court finds from an affidavit or testimony that the minor's health, safety, or welfare will be substantially harmed before a hearing with notice on the appointment can be held." RCW 11.130.225(4). If that is the case, a hearing must be held within five days to determine the appropriateness of the appointment. RCW 11.130.225(4).

Appointment of an emergency guardian "is not a determination that a basis exists for appointment of a guardian under RCW 11.130.185." RCW 11.130.225(5). A court may remove an emergency guardian at any time. RCW 11.130.225(6).

2.      J.L.'s Challenges Regarding the Emergency Petition are Moot

a.      Show cause hearing

J.L. argues that his right to due process was violated when the superior court commissioner appointed Kie and Kelly as limited emergency guardians on October 6, 2022, but failed to a hold a show cause hearing within five days. J.L. asserts that the "protracted" eight-month delay "illegally deprived" him of his right to parent J.S. and the commissioner repeatedly extended the limited emergency guardianship "without lawful authority." Br. of Appellant at 25. We hold that J.L.'s challenge to the emergency guardianship petition is moot.[11]

A challenge is moot when "the appellate court can no longer provide effective relief." *In re Dependency of L.C.S.*, 200 Wn.2d 91, 98, 514 P.3d 644 (2022). "When an appellant has already

---

[11] Mootness aside, J.L.'s briefing implies that the superior court did not afford him an opportunity to be heard for eight months after the filing of the emergency minor guardianship petition. However, the record shows that between October 2022, when the emergency petition was filed, and July 25, 2023, when the hearing on the emergency petition was held, the parties participated in 18 hearings during which the court addressed ongoing issues and offered repeated opportunities to the parties to be heard on those issues. Moreover, Kie and Kelly filed a minor guardianship petition in December 2022, which allowed for the extension of the emergency guardianship beyond the 120-day maximum set forth in the statute. RCW 11.130.225(7).

obtained the requested relief, an appeal is technically moot." *Dep't of Lab. & Indus. v. Fowler*, 23 Wn. App. 2d 509, 534, 516 P.3d 831 (2022), *review denied*, 200 Wn.2d 1027 (2023). Further, a final judgment renders the propriety of a temporary order moot. *Ferry County Title & Escrow Co. v. Fogle's Garage, Inc.*, 4 Wn. App. 874, 881, 484 P.2d 458, *review denied*, 79 Wn.2d 1007 (1971).

Here, J.L.'s challenge to the commissioner's alleged failure to hold a show cause hearing on the emergency petition within five days is moot. The purported relief we would provide J.L. would be to reverse the appointment of Kie and Kelly as emergency guardians and to return J.S. to J.L.'s care. However, the possibility of relief from the emergency guardianship petition became moot once the superior court held a trial on the full minor guardianship petition and appointed Kie and Kelly as full guardians of J.S. *Id.* There is no longer an emergency guardianship in place.[12] *Fowler*, 23 Wn. App. 2d at 534. Moreover, appointment of an emergency guardian "is not a determination that a basis exists for appointment of a guardian under RCW 11.130.185." RCW 11.130.225(5). Thus, even if there had been an error, that error would have had no bearing on a subsequent guardianship appointment.

Additionally, the factors that would allow this court to review a moot issue have not been met. Courts may consider a moot issue if it "is a matter of continuing and substantial public interest." *Dependency of L.C.S.*, 200 Wn.2d at 99. To determine whether an issue falls within the public interest exception, courts consider "whether the issue is of public or private nature, whether an authoritative determination is desirable to provide future guidance, and whether the issue is

---

[12] The most recent "Order on Emergency Minor Guardian," filed September 27, 2023, expired September 29, 2023. J.L. also appeals the Order on Emergency Minor Guardian, entered August 15, 2023, and the immediate emergency minor guardianship orders entered on December 29, 2022, February 10, 2023, and March 23, 2023. These orders also have already expired.

likely to reoccur." *Id.* While this case is public in nature insofar as it impacts family relationships, any procedural irregularities that arose were specific to the parties and not due to a lack of guidance, nor are they likely to reoccur in other circumstances. *Id.* Accordingly, the challenges to the emergency orders are moot.

> b. Appointment of grandparents as emergency guardians

J.L. argues that the superior court commissioner erred when it appointed Kie and Kelly as emergency guardians[13] because it applied the incorrect legal standard and because there was no showing that a guardianship was necessary to prevent substantial harm to J.S.'s health, safety, and welfare.

Again, J.L.'s challenge is moot. As stated above, there is no existing emergency minor guardianship in place, and the possibility of relief became moot once the superior court appointed Kie and Kelly as full guardians of J.S. after a trial on the minor guardianship petition. *Ferry County Title & Escrow Co.*, 4 Wn. App. at 881. Therefore, we decline to review the merits of J.L.'s arguments regarding the appointment of emergency guardians.[14]

---

[13] J.L.'s briefing conflates the emergency minor guardianship appointment with the full minor guardianship appointment. J.L. cited to the guardianship trial when he claimed that the superior court applied the incorrect standard in the emergency guardianship hearing. J.L. then advances arguments centered only on the appointment of emergency minor guardians and RCW 11.130.225. Thus, this opinion assumes J.L.'s challenge is to the appointment of Kie and Kelly as emergency minor guardians.

[14] Because the issues relating to the emergency petition are moot, we do not review J.L.'s appeal of the superior court's order denying dismissal of the emergency guardianship, dated July 18, 2023, and the order denying J.L.'s motion for revision of the emergency minor guardianship appointment, dated October 3, 2023.

B.      MINOR GUARDIANSHIP PETITION

J.L. argues that the superior court's finding that J.L. was willing but not able to perform parenting functions is not supported by substantial evidence. J.L. asserts that because the finding was not supported by substantial evidence, the superior court erred when it appointed Kie and Kelly as guardians. J.L. also argues for the termination of the minor guardianship because the basis for the guardianship no longer exists. We disagree.

1.      Legal Principles

A court may appoint a guardian for a minor if

the court finds the appointment is in the minor's best interest and:
    (a) Each parent of the minor, after being fully informed of the nature and consequences of guardianship, consents;
    (b) All parental rights have been terminated; or
    (c) There is clear and convincing evidence that no parent of the minor is willing or able to exercise parenting functions as defined in RCW 26.09.004.

RCW 11.130.185(2); *see generally* RCW 11.130.190. Under RCW 26.09.004, "parenting functions" means

those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child. Parenting functions include:
    (a) Maintaining a loving, stable, consistent, and nurturing relationship with the child;
    (b) Attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;
    (c) Attending to adequate education for the child, including remedial or other education essential to the best interests of the child;
    (d) Assisting the child in developing and maintaining appropriate interpersonal relationships;
    (e) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and

(f) Providing for the financial support of the child.

RCW 26.09.004(2).

A minor guardianship can terminate when

the court finds that the basis in RCW 11.130.185 for appointment of a guardian no longer exists, unless the court finds that:
(i) Termination of the guardianship would be harmful to the minor; and
(ii) The minor's interest in the continuation of the guardianship outweighs the interest of any parent of the minor in restoration of the parent's right to make decisions for the minor.

RCW 11.130.240(1)(b).

A superior court's minor guardianship determination is reviewed for an abuse of discretion. *In re Guardianship of F.S.*, 33 Wn. App. 2d 24, 35, 559 P.3d 138 (2024), *review denied*, 4 Wn.3d 1015 (2025). "Determining who should be appointed as a child's guardian is a fact-intensive inquiry that trial courts are necessarily in a better position than the appellate courts to decide." *In re Guardianship of L.C.*, 28 Wn. App. 2d 766, 772, 538 P.3d 309 (2023)).

Under the abuse of discretion standard, we will find error only if the "court's decision (1) adopts a view that no reasonable person would take and is thus manifestly unreasonable, (2) rests on facts unsupported in the record and is thus based on untenable grounds, or (3) was reached by applying the wrong legal standard and is thus made for untenable reasons."

*Guardianship of F.S.*, 33 Wn. App. 2d at 35 (quoting *Guardianship of L.C.*, 28 Wn. App. 2d at 772).

We review challenges to factual findings for substantial evidence. *Id.* Under the clear and convincing standard, substantial evidence exists "'when the ultimate fact in issue is shown by the evidence to be highly probable.'" *In re Dependency of A.N.C.*, 24 Wn. App. 2d 408, 414, 520 P.3d 500 (2022) (internal quotation marks omitted) (quoting *In re Dependency of K.R.*, 128 Wn.2d 129,

141, 904 P.2d 1132 (1995)), *review denied*, 1 Wn.3d 1012 (2023); RCW 11.130.185(2)(c).

"Unchallenged findings of fact are verities on appeal." *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

There is a "strong interest in the finality of cases involving the custody of a child, as disruption to the child's life can result in harm to the child." *Guardianship of L.C.*, 28 Wn. App. 2d at 772; *see generally In re Custody of C.D.*, 188 Wn. App. 817, 826, 356 P.3d 211 (2015) (stating, "'Appellate courts are generally reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties'" (quoting *In re Custody of Stell*, 56 Wn. App. 356, 366, 783 P.2d 615 (1989))). Further, we do not decide on appeal the credibility of witnesses or weigh evidence. *Welfare of A.W.*, 182 Wn.2d at 711.

2.       Substantial Evidence Supports Appointment of Grandparents as Guardians

Here, the record shows that J.L. consistently ignored J.S.'s daily needs, failed to attend to J.S.'s education and health, and did not exercise appropriate judgment regarding J.S.'s welfare. RCW 26.09.004(2)(b), (c), (e). For instance, during J.S.'s infancy, J.L. left J.S. in diapers for hours and only changed her when pressured to do so by others. J.L. would leave J.S. unattended and both expected and relied on others to provide for J.S.'s care. J.L. failed to notice that J.S. was developmentally delayed, a circumstance that ultimately required J.S. to undergo surgery and participate in a remedial development program.

J.L. left J.S. in Kie and Kelly's care, and he did not once inquire about J.S., her medical needs, or her education. Nor did J.L. attempt to see J.S. for over a year, even when he knew J.S. was undergoing surgery, despite family and friends reaching out to him with updates on J.S. After a visitation schedule was established, J.L. was consistently late to in-person visits or cut them

short, and J.L. often failed to show up for phone visits without explanation or advance notice. J.L. had not spent more than five hours alone with J.S. in the two years prior to trial. He would arrive unprepared to his in-person visits, despite seeing J.S. every weekend. Furthermore, at the time of trial, J.S. had spent the majority of her life in the care of Kie and Kelly.

The record also shows that J.L. was afforded ample opportunity over the course of nearly a year to demonstrate his ability to care for J.S., and he consistently did not do so. Throughout the guardianship action, J.L. did not seek his own housing, and indeed, was often not forthright about where he actually intended to live with J.S. J.L. claimed he took a parenting course; however, the course was a four-hour online course for parents with children going through divorce. J.L. always brought other individuals with him to his visits with J.S. rather than spend time with her alone. Moreover, J.L. failed to communicate with Farr or respond to Farr's inquiries regarding whether he had identified childcare options for J.S., a doctor for J.S., and if J.L. was looking for a job in Toledo. J.L. appears to have proceeded on the assumption that his simply wanting custody of J.S. and having a relationship with her was sufficient to establish that he could perform parenting functions.

Moreover, the record clearly demonstrates that Kie and Kelly have provided a stable and loving home for J.S. Kelly sought and coordinated medical care for J.S. Kelly enrolled J.S. in the Progress Center so that J.S. could achieve developmental milestones. Kelly practiced new skills with J.S. every day. Kie and Kelly enrolled J.S. in daycare and paid for J.S.'s expenses out of their own pockets. Indeed, Kie and Kelly never requested financial assistance from J.L.

J.L.'s conduct through the course of the proceedings demonstrated that he was unable to perform the parenting functions outlined in RCW 26.09.004(2). Thus, substantial clear and

convincing evidence supports the superior court's finding that J.L. is willing but unable to perform parenting functions. And given the evidence presented, a reasonable basis exists for the appointment of guardians for J.S. RCW 11.130.185(2)(c). Accordingly, the superior court did not abuse its discretion when it appointed Kie and Kelly as J.S.'s guardians. *Guardianship of F.S.*, 33 Wn. App. 2d at 35.

As for J.L.'s argument that the minor guardianship should be terminated, J.L. contends that the superior court "did not enter a finding that termination of the guardianship was harmful to [J.S.], or that [J.S.]'s interest in the guardianship outweighed [J.L.]'s interest in the restoration of his right to make decisions for [J.S.]." Br. of Appellant at 58. However, J.L.'s contention is belied by the record. The superior court ruled:

> [T]here's not going to be a termination of the guardianship at this point [be]cause I . . . find that it would be harmful . . . to J.S. if that were to occur. And it's not in [J.S.]'s best interest for the guardianship to end at this time.

3 VRP (Sept. 29, 2023) at 1109.

Thus, because substantial clear and convincing evidence supports the superior court's finding that J.L. is willing but unable to perform parenting functions and because the superior court found that terminating the guardianship would be harmful to J.S. and not in her best interests, we affirm the superior court.

CONCLUSION

J.L.'s challenges to the emergency minor guardianship orders are moot. Additionally, because substantial evidence in the record supports a finding that J.L. is unable to perform parenting functions, the superior court did not err when it appointed J.L.'s father and stepmother as full guardians of J.S. We affirm.

Lee, J.

We concur:

Veljacic, A.C.J.

Che, J.